UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------x

CROWN CASTLE FIBER LLC,

<table>
<tr><td></td><td></td></tr>
</table>

|  |  |
|---|---|
| Plaintiff, | **COMPLAINT** |
| -against- |  |
|  | DOCKET NO._____ |

TOWN OF OYSTER BAY, TOWN OF OYSTER BAY TOWN
BOARD, TOWN OF OYSTER BAY ZONING BOARD OF
APPEALS, ELIZABETH MACCARONE in her official capacity
as Commissioner of the Town of Oyster Bay Department of
Planning and Development and RICHARD LENZ in his official
capacity as Commissioner of the Town of Oyster Bay Highway
Department and Department of Public Works,

Defendants.

---------------------------------------------------------------------------x

Plaintiff Crown Castle Fiber LLC, formerly known as Crown Castle NG East LLC,

("Crown Castle"), by its attorneys Snyder & Snyder, LLP, as and for its Complaint against

defendants Town of Oyster Bay ("Oyster Bay"), Town of Oyster Bay Town Board ("Town

Board"), Town of Oyster Bay Zoning Board of Appeals ("ZBA"), Elizabeth Maccarone, in her

official capacity as Commissioner of the Town of Oyster Bay Department of Planning and

Development, and Richard Lenz, in his official capacity as Commissioner of the Town of Oyster

Bay Highway Department and Department of Public Works, (collectively, the "Town"),

respectfully alleges as follows:

## Nature of the Action

1.      The Nation's wireless infrastructure is a critical communications pathway

extensively employed and heavily relied on by the public—including residents and businesses, the

traveling public, emergency service providers, hospitals and health care professionals, law

enforcement personnel, government officials, and the 911 North American emergency system—

1

and it is increasingly replacing traditional wireline phones altogether. Both Congress and the Federal Communications Commission ("FCC") have emphasized the importance of a seamless nationwide wireless network and the need to allow wireless carriers to move quickly to construct needed facilities. This case involves small wireless telecommunications facilities that are needed to support various FCC-licensed wireless carriers, who provide telecommunications and personal wireless services to the public.

2.     This action arises from Crown Castle's submission of 23 applications for special permit approval to the ZBA ("Applications") to install 23 small wireless facilities ("Facilities") within the public rights-of-way ("ROW"), to which (i) the Town imposed unreasonable, excessive, and prohibitive escrow charges and application fees; (ii) the Town required a ROW use agreement with Crown Castle but refused to execute one; (iii) the Town's burdensome municipal code requirements and application review processes made it impossible to obtain the Applications' approval within the 90-day period set forth by the FCC for such applications; and (iii) the ZBA unreasonably and without substantial evidence in the written record denied the Applications. All of the listed actions above resulted in the Town effectively prohibiting telecommunication services and personal wireless services.

3.     There are significant gaps in wireless services in Oyster Bay that will be filled by the installation and operation of the Facilities.

4.     The Facilities are the least intrusive means to fill these gaps.

5.     The Town's denial of the Applications materially inhibit or limit the provision of telecommunications service and personal wireless services.

6.     As a result, the Town has violated Sections 332(c)(7)(B) and 253(a) of the Telecommunications Act of 1996 (the "TCA") by denying the Applications without the support of

substantial evidence in the written record and effectively prohibiting the provision of telecommunications service and personal wireless services, all of which warrant a reversal of the denials with injunctive relief mandating that the Town issue all required approvals, including an executed ROW use agreement, 23 special permits from the ZBA, 23 building permits from Oyster Bay's Department of Planning and Development, 23 highway permits from the Highway Department for the construction of the Facilities, and any other necessary approvals for the construction of the Facilities.

7. Crown Castle is entitled to an expedited review of this action pursuant to § 332(c)(7)(B)(v) of the TCA, providing that "[t]he court shall hear and decide such action on an expedited basis."

## The Parties

8. Plaintiff Crown Castle is a limited liability company organized under the laws of the State of New York and located at 8020 Katy Freeway, Houston, Texas 77024. Crown Castle has been granted a Certificate of Public Convenience and Necessity ("CPCN"), by the Public Service Commission of the State of New York in order to offer its telecommunications service to its customers in the State. That CPCN remains in effect. Crown Castle constructs and deploys facilities for the provision of telecommunications service and/or personal wireless services to the public as those terms are used and defined in §§ 153(53) and 332(c)(7)(C), respectively, of the TCA.

9. Defendant Oyster Bay is a municipal corporation of the State of New York, located at Town Hall East, 54 Audrey Avenue, Oyster Bay, New York 11771, and Town Hall South, 977 Hicksville Road, Massapequa, New York 11758.

10. Defendant Town Board is the municipal agency ultimately responsible for the

management of the ROW, and authorized to issue consent for the use of ROW as a matter of state law. Defendant Town Board is also the duly constituted town board of Defendant Oyster Bay, and is the municipal agency responsible for overseeing all town departments.

11. Defendant ZBA is the duly constituted zoning board of appeals of Defendant Oyster Bay, authorized to issue special use permits for the Facilities pursuant to Chapter 242 of the municipal code and New York State Town Law.

12. Defendant Elizabeth Maccarone is the duly authorized Commissioner of Defendant Oyster Bay's Department of Planning and Development and oversees the Building Department, which is responsible for issuing building permits and granting waivers of special use permits pursuant to Chapter 242 of Oyster Bay's municipal code.

13. Defendant Richard Lenz is the duly authorized Commissioner of Oyster Bay's Highway Department and Department of Public Works and is empowered to grant the highway permits within the ROW at issue in this action.

## Jurisdiction and Venue

14. This Court has subject matter jurisdiction over this action pursuant to: (i) 47 U.S.C. § 332(c)(7)(B)(v) of the TCA, because Crown Castle has been adversely affected and aggrieved by the Town's actions in violation of 47 U.S.C. § 332(c)(7)(B) and (ii) 28 USC § 1331 because this is a civil action that presents federal questions arising under the TCA.

15. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

16. This Court has supplemental jurisdiction over any and all New York State Law claims pursuant to 28 U.S.C. §1367.

17. This Court has personal jurisdiction over the Town because the Town is domiciled

within the jurisdiction of United States District Court, Eastern District of New York and the claims stated herein arose in the same jurisdiction.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims stated herein arose in the judicial district for the United States District Court, Eastern District of New York, and the Defendants reside in this District.

**The Important Federal Interests at Issue in This Case**

19.     As set forth in the TCA, and the FCC rules, regulations, and orders promulgated pursuant thereto, Congress has declared a public need for wireless communication services such as "personal wireless services" to be deployed without delay to the public.

20.     By enacting the TCA, Congress intended to "provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies to all Americans." H.R. Rep. No. 104-458, at 206 (1996) (Conf. Rep.); *See* 1996 U.S. Code Cong. and Adm. News, p. 10.

21.     The FCC regulates the provision of personal wireless and telecommunications service to the public.

22.     The FCC grants licenses to providers of personal wireless services to use limited resources, frequencies, and spectrum allocated by the FCC for the provision of such services to the public.

23.     These essential wireless services are needed to place those living and passing through the area on equal footing with homes, businesses, and travelers throughout the state who have access to wireless communication and data services, in furtherance of the national policy goal that Congress and the FCC have repeatedly confirmed (i.e., to facilitate the rapid deployment of wireless access so as to ensure that all Americans have access to this critical utility).

24.     The TCA, while preserving state and local authority over the placement, construction, or modification of wireless facilities, expressly preempts state or local governments from effectively prohibiting the provision of telecommunications service, personal wireless services and from implementing decisions that are not supported by substantial evidence.

25.     Section 332(c)(7)(B) of the TCA imposes a number of procedural and substantive limitations on local zoning decisions to ensure that those decisions do not frustrate the TCA's goals of promoting competition, higher quality services, and the rapid deployment of new telecommunications technologies.

26.     Section 332(c)(7)(B)(i) provides that:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof –
>
> (I)     shall not unreasonably discriminate among providers of functionally equivalent services; and
> (II)    shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

27.     Section 332(c)(7)(B)(ii) provides that:

> A State or local government or instrumentality thereof shall act on any request for authorization to place, construct or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

28.     Section 332(c)(7)(B)(iii) requires that:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

29.     Section 332(c)(7)(B)(iv) provides that:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service

facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

30.     Section 332(c)(7)(B)(v) provides that:

Any person adversely affected by any final decision or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis…

31.     Section 253(a) provides that:

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

32.     Crown Castle provides the infrastructure, such as the Facilities, also known as personal wireless services facilities, as defined by the TCA, for the provision of mobile telephone and other personal wireless services in the State of New York.

33.     This action is ripe for determination under the TCA and was timely filed.

## Crown Castle's Facilities and Network

34.     Crown Castle provides "telecommunications service" as that term is defined by the by 47 U.S.C. § 153(53) of the TCA.

35.     Crown Castle's telecommunications service consists of transporting Crown Castle's customers' communications (voice and data) over fiber optic lines between points designated by the customer without altering the content of the communications.  In this case, the communications are to be transmitted over its distributed antenna system ("DAS") network.

36.     Crown Castle's current and potential customers in Oyster Bay are retail providers of wireless telecommunications service providers (also known as Commercial Mobile Radio Services), cellular, or Personal Communications Services providers such as the carrier customer

seeking to expand its services in Oyster Bay and use Crown Castle's expanded DAS network.

37.     Crown Castle's typical telecommunications service offering involves a communication signal handed off from Crown Castle's customer, which Crown Castle then transports over fiber optic lines.  This handoff and transport takes place through equipment configurations called "nodes" that are located on utility or streetlight poles in the ROW.

38.     The typical nodes in Crown Castle's network consist of electronic equipment that converts radio frequency format communications to light signals carried over fiber optic lines.

39.     The nodes in Crown Castle's DAS network include small, low-power antennas, laser and amplifier equipment to convert RF signals to optical signals (and vice versa, i.e., from optical to RF), that is connected to the antennas, fiber optic lines, and associated equipment such as power supplies, which are operated, controlled, managed and/or maintained by Crown Castle.

40.     Upon handoff from its customer at a node, Crown Castle transports communications through a fiber optic network to a distant point that is typically, but not always, an aggregation point for Crown Castle's communications called a "Base Station."

41.     The Base Station is usually a facility of Crown Castle's customer that is a central location containing such equipment as routers, switches and signal conversion equipment.

42.     Crown Castle hands the communication signal back to its customer at the Base Station, where the communications signal may be interconnected with the public switched telephone network or the internet.

43.     All wireless radio frequency transmissions are performed by Crown Castle's customers, who control and are responsible for their licensed, proprietary radio frequency spectrum.

44.     Crown Castle's DAS network is used by Crown Castle's customers to facilitate

their provision of personal wireless services.

45. Crown Castle's nodes constitute personal wireless service facilities as defined in § 332(c)(7) of the TCA.

46. The State of New York recognizes that Crown Castle's Facilities are public utility facilities for the purpose of zoning applications. *See Orange County-Poughkeepsie Ltd. P'ship v. Town of East Fishkill*, 84 F. Supp. 3d, 294, 295 (S.D.N.Y. 2015) (citing *Cellular Tel. Co. v. Rosenberg,* 82 N.Y.S.2d 364 (1993) and *Omnipoint Commc'ns, Inc. v. Town of LaGrange,* 658 F. Supp. 2d 539, 555 (S.D.N.Y. 2009)).

47. Crown Castle's existing and proposed services provided in the Town are facilities-based telephone service and telecommunications service.

48. The end users of these services (the general public) communicate through handsets, mobile telephones, and other media via a network of wireless service facilities such as those Crown Castle seeks to deploy here, each of which operate at low wattages and use the finite amount of the radio frequency spectrum allotted by the FCC.

49. The 23 proposed nodes/Facilities include antennas within a cylinder that is approximately either 48 or 24-inches high and 14.6 inches in diameter, which is attached to an approximately 35-foot wooden utility pole, together with a shroud equipment box containing telecommunications equipment mounted to the utility pole, being 47.5 inches in height, 22 inches in width and 12.4 inches in depth.

50. In accordance with the FCC, the Facilities qualify as "Small Wireless Facilities" and thus are entitled to an expeditious 90-day application review period because (a) they are mounted on structures 50 feet or less in height including their antennas; (b) each antenna, excluding antenna equipment is less than three cubic feet in volume; (c) all other equipment associated with

the structure and antenna is no more than 28 cubic feet in volume; (d) they do not require registration with the Federal Aviation Administration; (e) they are not located on tribal lands; and (f) their radio frequency emissions are well below the FCC-specified safety standards.

<u>**Background Between the Parties**</u>

51.     Crown Castle has been seeking approval for the installation of its Facilities since August 2016.

52.     In 2009, when Crown Castle's predecessor in interest NextG Networks of NY, Inc. ("NextG"), first sought to install its DAS network in Oyster Bay, NextG received a letter from the Office of the Town Attorney dated January 22, 2009 which stated "[t]his letter shall serve to confirm that no Town permits are required for the installation of your equipment [DAS] on existing poles owned by the various utilities. Permits are required, however, if said installation involves the placement of underground wires." This letter was signed by then acting Deputy Town Attorney Fredrick E. Mei.

53.     From 2009 to 2016, over 100 DAS nodes were installed by Crown Castle or NextG in the Town of Oyster Bay.

***2016-2017 Applications***

54.     In late summer to fall 2016, Crown Castle submitted highway permit applications ("2016 Applications") to the Town to install 24 DAS facilities in the ROW. These 2016 Applications included construction drawings for each proposed site and the certificates of insurance the Town requires for issuance of permits. The construction drawings detailed all of the proposed equipment, including the antennas, cables and equipment shrouds.

55.     Crown Castle met with members of the Town Attorney's office and the Supervisor's office and agreed to lower the height of each facility by fifteen feet and relocated half of the facilities based on the Town's request.

56.     Between August 2016 and April 2017, the Town reviewed Crown Castle's 2016 Applications for the proposed 24 facilities.

57.     On April 5, 2017, the Town issued highway permits for 22 out of the 24 2016 Applications.

58.     On April 6, 2017, Crown Castle notified the Town that it had only received 22 of the 24 permits sought and that two permits were missing or still not issued.

***Town's Revocation of 2017 Permits***

59.     Upon receipt of the 22 permits, Crown Castle began the process of installing its Facilities and substantially completed construction.

60.     After Crown Castle began installing its telecommunications equipment (after receiving the permits for 22 of the 2016 Applications), nearby residents began complaining about the equipment.  Specifically, those residents voiced unfounded fears over environmental effects and health risks from radio frequency emissions.

61.     On May 9, 2017, Crown Castle, the 22 issued permits and the Supervisor's refusal to follow federal law were all discussed at length at a Town Board meeting.

62.     Crown Castle was not notified by the Town that the revocation of its permits would be discussed at the May 9, 2017 Town Board meeting, and consequently, Crown Castle's representatives were not in attendance.

63.     At the May 9, 2017 Town Board meeting, there were comments from residents who voiced concerns over radio frequency emissions and their impacts to the environment.

64.     At the May 9, 2017 Town Board meeting, then recently appointed Supervisor Saladino, stated that the Town would not provide access to the ROW for personal wireless service providers such as Crown Castle, and at the close of the discussion regarding Crown Castle's

telecommunications facilities, Supervisor Saladino ordered the Town to "revoke or stop any permit that has been previously issued."

65.     By letter dated May 10, 2017 from the then Town Attorney, Joseph Nocella, Esq., the Town ordered Crown Castle "to cease and desist from any further work in connection with the installation of cell repeaters and poles with respect to any Town of Oyster Bay right of way permits."

66.     In or about the summer of 2017, the Town removed two of the previously installed nodes and in the process, broke and destroyed Crown Castle's telecommunications equipment.

67.     On June 8, 2017, Crown Castle filed a federal complaint in this jurisdiction, 17-cv-3445 (SJF) (ARL) seeking to enforce its rights under the TCA and New York state law in response to the Town's revocation of the 22 permits and failure to act on the two remaining applications.

68.     Each side submitted a motion for summary judgment. The Court granted the Town's motion, and Crown Castle is currently appealing this decision.

**The 2020 Applications for the Facilities**

69.     Initially, Crown Castle sought building permits and highway permits for the Facilities, but the Town would not issue these permits without Crown Castle first obtaining special use permits and executing a ROW use agreement.

70.     On July 28, 2020, Crown Castle submitted the 22 new Applications to install its Facilities in the ROW, which Applications are the subject of this litigation.

71.     Crown Castle requested a waiver from the Department of Planning and Development exempting it from the requirement to obtain special use permits from the ZBA, in accordance with Town Code §242-5(A).

72.     The Town issued an internal letter on August 4, 2020 deeming the Applications

incomplete and noted the following deficiencies: (1) Application Form required additional information including information for Property Owner and Contractor; (2) an escrow check of $8,500.00 per application; (3) additional information on Crown Castle's corporate entity as it relates to past filing fees; and (4) failure to have Property Owner execute application form ("August 4th Letter").

73.     The required escrow and application fees imposed by the Town totaled $219,050.00 (24 applications x $8,500.00 escrow fee for each node + 24 applications x $100.00 building permit fee for each node + 23 applications [one node was on county property so Town approval was not needed] x $550.00 special use permit fee for each node). Crown Castle paid these fees to the Town under protest.

74.     The escrow and application fees are prohibitive as they materially inhibit or limit Crown Castle's ability to provide telecommunications service and personal wireless services.

75.     The FCC has explained the following:

> {W]e presume that the following fees would not be prohibited by Section 253 or Section 332(c)(7): (a) $500 for non-recurring fees, including a single up-front application that includes up to five Small Wireless Facilities, with an additional $100 for each Small Wireless Facility beyond five, or $1,000 for non-recurring fees for a new pole (*i.e.*, not a collocation) intended to support one or more Small Wireless Facilities; and (b) $270 per Small Wireless Facility per year for all recurring fees, including any possible ROW access fee or fee for attachment to municipally-owned structures in the ROW.

In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. 9088 (2018), *aff'd in relevant part City of Portland v. United States*, 969 F.3d 1020 (2020), *cert denied sub nom. City of Portland, Oregon v. FCC*, 141 S. Ct. 2855 (2021),

76.     The Town's escrow and application fees are well in excess of the presumptively

permissible standard.

77.     The August 4th Letter was only obtained by Crown Castle through a FOIL request, and with respect to the Town's request for additional property owner information and application forms to be executed by "Property Owner," it is noted that the Town can only be considered the Property Owner for the ROW because the Town is charged with managing the ROW.

78.     The Town returned the 22 Applications filed refusing to allow Crown Castle to supplement the filed Applications and required whole new applications be filed by Crown Castle.

79.     On August 12, 2020, Crown Castle again submitted 22 Applications for its proposed Facilities including a statement that the requested escrow checks would only be submitted under protest and with a reservation of rights.

80.     On August 18, 2020, the Town stated that the Applications were deficient for the following reasons: (1) application forms submitted were copies and not originals; (2) property owner information was not completed; and (3) the electrician on the Applications had an expired Town license.

81.     Between August 18, 2020 and September 14, 2020, Crown Castle attempted to obtain Town signatures for the property owner portion of the Applications.

82.     On September 14, 2020, Crown Castle again submitted the 22 Applications together with 2 additional Applications (24 total Applications) to the Town.

83.     By letter dated September 23, 2020, the Town informed Crown Castle that the Applications were again deemed incomplete for failure to have the Property Owner signatures on the Applications, and that some of the escrow checks were missing.

84.     On September 24, 2020, Crown Castle submitted revised applications for four of the previously filed applications due to changes in design that the Town had requested.

85.     On September 25, 2020 Crown Castle submitted revised drawings and applications for three of the previously filed applications due to change in location, also demanded by the Town, and under protest filed the remaining escrow checks the Town required. Crown Castle also informed the Town that one of the Applications was withdrawn as the new location demanded by the Town is on a County-managed ROW that did not require Town approval. Hence, the Applications were now for 23 Facilities.

86.     By letter dated January 13, 2021, counsel for Crown Castle asked the Town to confirm whether it would grant - or not Crown Castle's waiver request in accordance with § 242-5(A) of the Town Code.

87.     By letter dated January 15, 2021, the Town informed Crown Castle that it refused to issue the waivers, stating only that "[a]s the issuance of a Special Use Permit is within the authority of the Zoning Board of Appeals, the Town will not supplant that authority and issue a waiver."

88.     The January 15, 2021 letter from the Town was drafted and signed by Joseph E. Macy, Esq. who is outside counsel for the Town; the letter was not drafted or signed by the Commissioner of Planning and Development, which is the only Town official authorized by the Town Code to decide Crown Castle's wavier requests.

89.     Commissioner Maccarone failed to respond to Crown Castle's wavier requests.

90.     In response to the Town's refusal to grant the requested waivers, Crown Castle filed special permit applications with the ZBA.

91.     A special permit use is deemed a permitted use under New York law when the objective and express special use permit criteria under the local zoning code are met.

92.     The Applications met all the Town Code's requirements to obtain special use

permits.

93.     Crown Castle's Applications and subsequent submissions included all the supporting material required by the Town Code and material/information requested by the ZBA, including the following:  application forms, Crown Castle's responses to Town Code information requirements; a study by an appraiser demonstrating that the Facilities will not result in a diminution of property values; a statement by Gregory Sharpe, Crown Castle's Senior Radio Frequency Engineer detailing the equipment proposed as part of the Facilities and the need for such equipment; copies of FCC Licenses; FCC-compliance reports concerning radio frequency emissions; a radio frequency report and subsequent responses prepared by PierCon Solutions LLC demonstrating the significant gaps in services identified and the need for the Facilities; various drawings and plans of the Facilities, including those where Crown Castle accommodated the Town's request to reduce the size of certain antenna cannisters; and a report from a professional planner, Nancy Doone with VHB Engineering, demonstrating the Applications' and Facilities' compliance with the Town Code and that they are the least intrusive to the Town, with subsequent responses to the Town's comments.

94.     In addition, Crown Castle representatives met with the Town's representatives and conducted a location-by-location site visit together to review each Facility site, with Crown Castle relocating or re-designing each and every Facility requested by the Town at this site visit.

95.     The Town also required Crown Castle to agree to a ROW use agreement with the Town before it could install its Facilities, regardless of special use permits.

96.     There is nothing in the Town Code that requires Crown Castle to execute a ROW use agreement.

97.     During the Applications process, however, Crown Castle worked diligently with

the Town to obtain a ROW use agreement, and even though the Town and Crown Castle agreed to the terms of a ROW use agreement, the Town refused to execute the agreement

98.     The Town scheduled the Applications for a public hearing before the ZBA on March 25, 2021 and informed Crown Castle of the public notice requirements.

99.     The public notice requirements are overly burdensome, requiring over 644 properties to be mailed by certified mail notice of the public hearing.

100.     Due to the complications with the public notice requirements the March 25, 2021 public hearing was postponed, re-noticed, and the public hearing for the Applications was held on May 20, 2021 ("May Public Hearing").

101.     At the May Public Hearing, planning expert Nancy Doone testified to the Facilities' compliance with Town Code and to being the least intrusive to the Town. Radio frequency expert Rich Conroy also testified to the existing significant gaps in services that will be filled by the Facilities if the Applications are approved.

102.     At the May Public Hearing there were numerous public comments from residents in opposition to the Applications which included unfounded fears of environmental impacts from radio frequency emissions, and comments on the identified significant gaps in service based on individual anecdotal experiences.

103.     Crown Castle's written submissions and presentation at the Public Hearing provided substantial and uncontroverted evidence demonstrating that the Applications satisfy the criteria and requirements for the requested special permit approvals under both state law and federal law, as well as the Town Code.

104.     There is no recorded credible evidence disputing the existence of the identified significant gaps in services and the need for the Facilities.

105.    There is no recorded credible evidence refuting Crown Castle's substantial evidence that it met the criteria for the requested special permit approvals.

106.    Crown Castle also presented substantial and uncontroverted evidence in its Applications and at the May Public Hearing demonstrating that Crown Castle thoroughly investigated the possibility of other viable alternatives, but that no other feasible and less intrusive plan was available, and there is no recorded credible evidence refuting this.

107.    In fact, the record demonstrates that the types of Facilities proposed by Crown Castle were an alternative less intrusive technology (Small Wireless Facilities as opposed to a new 150-foot tower in the area) and that there were no viable alternatives to address the significant gaps in services other than the Facilities.

108.    The ZBA adjourned the May Public Hearing and took no action.

109.    The ZBA scheduled a continuation of the public hearing to September 9, 2021 for the purposes of issuing a decision only ("September Public Hearing").

110.    At the September Public Hearing, the ZBA voted to deny the Applications in a 6-0 vote, (Board Member Jerome Fitzpatrick was absent).

*Written Denial*

111.    Defendant ZBA issued a single written decision of denial for all 23 Applications dated October 15, 2021 ("ZBA Denial").

112.    The ZBA Denial ignores the facts in the record before it, is conclusory, and is not supported by substantial evidence on the written record.

113.    Beyond the references to the public comments on the alleged environmental effects of radio frequency emissions, personal anecdotal experiences with cellular service, and the misstatements regarding the availability of alternative locations, the ZBA provided no discernable

reasons for its decision to deny the Applications.

114.    The ZBA Denial fails to specify individual reasons for the denial of each Application and includes no individual review of the 23 proposed Facilities.

115.    Without the Facilities, Crown Castle is materially inhibited from providing telecommunication service and personal wireless services to the Town and surrounding areas.

**Irreparable Injury, Public Interest, and Balance of Hardships**

116.    Crown Castle has demonstrated the need for the injunctive relief requested herein, including an order directing the Town to issue all necessary approvals for Crown Castle to construct the Facilities.

117.    As a result of Town's actions, Crown Castle, its customers, and the public has been, and will continue to be damaged and irreparably harmed absent the relief requested herein.

118.    The injury to Crown Castle's affects its ability to provide its customers with the high-quality, reliable services they need and rightfully expect; (ii) the ability to compete with other providers of telecommunications service; (iii) the full use of its existing CPCN and business investments; and (iv) the good will of its customers and its business reputation.

119.    The harm that Crown Castle has suffered and is suffering is not reasonably susceptible to accurate calculation and cannot be fully and adequately addressed through an award of damages.

120.    Moreover, the public interest in promoting competition in the telecommunications arena and the rapid deployment of this evolving technology – the express goal of the TCA – has been irreparably harmed and will continue to be irreparably harmed by the Town's unlawful acts.

121.    In addition, wireless telecommunications are an important component of public safety and emergency response systems and provide a vital alternative to traditional land lines

during times of public crisis. By preventing Crown Castle from installing its Facilities necessary to provide reliable wireless services, the Town is causing irreparable harm to the public with deprivation or delay of reliable emergency communications.

122.    In contrast to the immediate and irreparable injury being suffered by Crown Castle, its customers, and the public, the Town will suffer no significant injury if the Court issues the requested injunctive relief. Moreover, Crown Castle has met all the requirements for the approvals it seeks under controlling local codes, state and federal laws and/or precedent.

### Allegations Supporting Declaratory Relief

123.    A present and actual controversy has arisen and now exists between the parties regarding their respective legal rights and duties. Crown Castle contends that the Town's actions are in violation of the TCA and that it is entitled to all of the approvals necessary to proceed with the project.

124.    Crown Castle, its customers, and the public have been and will continue to be adversely affected by the Town's unlawful acts and any further delay in approval and construction of the Facilities.

125.    Accordingly, declaratory relief is appropriate and necessary to adjudicate the extent of Crown Castle's rights and the Town's duties and authority.

### COUNT I

**Violation of 47 U.S.C. § 332(c)(7)(B)(iii) – Denial of the Applications Was Not Based on Substantial Evidence in the Written Record**

126.    Crown Castle realleges and incorporates by reference all preceding paragraphs.

127.    Pursuant to 47 U.S.C. §332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and *supported by substantial evidence contained in a*

*written record.*" (Emphasis supplied).

128. The Applications satisfied the criteria specified in the Town Code, state law, and federal law.

129. The ZBA Denial is inconsistent with the criteria specified in the Town Code, state law, and under federal law.

130. The ZBA Denial eschews the actual factual evidence in the written record and rests instead on claims unsupported by any credible evidence and in contradiction to the abundant evidence presented by Crown Castle and its experts.

131. The written record does not contain substantial evidence that would lead an objective and reasonable person to deny the Applications.

132. The ZBA Denial is in violation of and preempted by 47 U.S.C. § 332(c)(7)(B)(iii) and must be set aside and enjoined by the Court. Further, this Court should exercise its equitable power to issue an order directing the Town to issue all local permits and approvals required to construct and operate the Facilities.

## COUNT II

### Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II)—Effective Prohibition

133. Crown Castle realleges and incorporates by reference all preceding paragraphs.

134. Pursuant to 47 U.S.C. §§332(c)(7)(B)(i)(II), "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . *shall not prohibit or have the effect of prohibiting* the provision of personal wireless services." (Emphasis supplied).

135. Crown Castle submitted documentation with its Applications and subsequent responses and filings that demonstrate significant gaps in reliable services exists in the area where

the Facilities are proposed.

136. The Facilities would remedy the identified significant gaps.

137. Crown Castle made a good faith effort to review and locate the Facilities at the least intrusive sites available and with the least intrusive means available, and there is no credible evidence to the contrary.

138. Without the Facilities, Crown Castle is materially inhibited or limited from providing personal wireless services facilities to the Town and surrounding areas.

139. The ZBA Denial effectively prohibits the provision of personal wireless services in violation of § 332(c)(7)(B)(i)(II) of the TCA. Accordingly, ZBA's Denial must be set aside and enjoined on that basis. Further, this Court should exercise its equitable power to issue an order directing the Town to issue all local permits and approvals required to construct and operate the Facilities.

## COUNT III

### Violation of 47 U.S.C. § 253(a) - Prohibition of Service

140. Crown Castle realleges and incorporates by reference all preceding paragraphs.

141. 47 U.S.C. § 253(a) provides that "[n]o state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

142. The Town Code and the Town's application review processes and criteria, and resulting denial of the Application, obstruct, prevent, and bar entry to the deployment of Crown Castle's telecommunications service in the Town.

143.     The Town Code and the Town's application review processes and criteria make it impossible to obtain approval of the Applications within the prescribed 90-day period set forth by the FCC.

144.     The Town's escrow and application fees are unreasonable and exorbitant and result in the effective prohibition of telecommunications service.

145.     The Town's legal requirement that Crown Castle enter into a ROW use agreement with the Town regardless of whether permits are issued effectively prohibits the provision of telecommunications service.

146.     The Town's prohibitive Town Code, processes, and legal requirements are in violation of, and preempted by, Section 253(a) of the TCA and must be set aside and enjoined on that basis. Further, this Court should exercise its equitable power to issue an order directing the Town to issue all local permits and approvals required to construct and operate the Facilities.

**WHEREFORE**, Crown Castle respectfully demands judgment of this Court on the Counts set forth above as follows:

1.     On the First Count, an order and judgment (i) finding that the ZBA Denial was illegal as it was not based on substantial evidence contained in the written record; and (ii) mandating that the Town immediately issue Crown Castle all necessary permits and authorizations, including, but not limited to 23 special use permits, 23 building permits, and 23 highway permits that allow Crown Castle to construct and operate the Facilities.

2.     On the Second Count, an order and judgment (i) finding that the Town has effectively prohibited the provision of personal wireless services; and (ii) mandating that the Town immediately issue Crown Castle all necessary permits and authorizations, including but not limited to 23 special use permits, 23 building permits, and 23 highway permits that allow Crown Castle to

construct and operate the Facilities.

3.      On the Third Count, an order and judgment (i) finding that the Town has effectively prohibited the provision of personal wireless services; and (ii) mandating that the Town immediately issue Crown Castle all necessary permits and authorizations, including but not limited to 23 special use permits, 23 building permits, and 23 highway permits that allow Crown Castle to construct and operate the Facilities.

4.      On all Counts, Crown Castle's costs, expenses, and attorney fees, and any and all other damages and interest to which Crown Castle is lawfully entitled, together with such other and further relief as the Court deems just and proper.

Dated: Tarrytown, New York
      November 12, 2021

**SNYDER & SNYDER, LLP**

By:       _____/s/_____

Robert D. Gaudioso
Carlotta Cassidy
*Attorneys for the Plaintiff*
94 White Plains Road
Tarrytown, New York 10591
914.333.0700
rgaudioso@snyderlaw.net
ccassidy@snyderlaw.net