**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
CROWN CASTLE FIBER LLC,

                          *Plaintiff*,

                       *-against-*

                 **REPORT AND**
                 <ins>**RECOMMENDATION**</ins>
                 21-CV-6305 (JMA)(JMW)

TOWN OF OYSTER BAY, TOWN OF OYSTER BAY
TOWN BOARD, TOWN OF OYSTER BAY ZONING
BOARD OF APPEALS, ELIZABETH MACCRONE,
*in her official capacity as Commissioner of the Town of*
*Oyster Bay Department of Planning and Development*, and
RICHARD LENZ, *in his official capacity as Commissioner*
*of the Town of Oyster Bay Highway Department and*
*Department of Public Works*,

                     *Defendants*.
-------------------------------------------------------------X

**A P P E A R A N C E S:**

Carlotta Cassidy-Young, Esq.
**Consolidated Edison Company of New York, Inc.**
4 Irving Place
18th Floor
New York, NY 10003
*Attorneys for Plaintiff*

Jonathan D Kaufman, Esq.
Robert D. Gaudioso, Esq.
**Snyder & Snyder LLP**
94 White Plains Road
Tarrytown, NY 10591
*Attorneys for Plaintiff*

Donna A. Napolitano, Esq.
Joseph E. Macy, Esq.
**Berkman, Henoch, Peterson, Peddy & Fenchel, P.C.**
100 Garden City Plaza
Garden City, NY 11530
*Attorneys for Defendants*

**WICKS,** Magistrate Judge:

Plaintiff, Crown Castle Fiber LLC ("Crown Castle" or "Plaintiff"), commenced this action against the Town of Oyster Bay (the "Town"), Town of Oyster Bay Town Board ("Town Board"), the Town of Oyster Bay Zoning Board of Appeals (the "ZBA"), Elizabeth Maccrone ("Commissioner Maccrone"), and Richard Lenz (collectively, "Defendants"),[1] alleging violations under Sections 253 and 332 of the Federal Communications Act of 1934, as amended by the Telecommunications Act of 1996 ("Telecommunications Act" or the "TCA") (ECF No. 1). Before the Court, on referral from the Hon. Joan M. Azrack (*see* Electronic Order dated October 18, 2023), is Plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (*see* ECF Nos. 29, 31), which is opposed by Defendants (ECF No. 30). For the reasons stated herein, the undersigned respectfully recommends that Plaintiff's motion for summary judgment be **GRANTED**.

---

[1] Pursuant to Fed. R. Civ. P. 17(b), an entity can only be sued in federal court if it would be suable under the laws of the state where it was created. *See Omnipoint Communications v. Town of LaGrange*, 658 F.Supp.2d 539, 552 (S.D.N.Y.2009) (citation omitted) ("*LaGrange*"). In this case, the Court applies New York law to determine who is a proper party in this action. Plaintiff has sued the Town of Oyster Bay, the Town of Oyster Bay Town Board, the Town of Oyster Bay Zoning Board of Appeals, and Elizabeth Maccrone and Richard Lenz in their official capacities. In New York, however, agencies of a municipality are not suable entities because they are "merely administrative arms of a municipality" that "do not have a legal identity separate and apart from the municipality." *Hall v. City of White Plains*, 185 F.Supp.2d 293, 303 (S.D.N.Y.2002); *see also LaGrange*, 658 F.Supp.2d at 552 (collecting cases). Therefore, the undersigned finds the Town of Oyster Bay Town Board and the Town of Oyster Bay Zoning Board of Appeals are improper defendants in this action, and respectfully recommends they be dismissed. *See e.g., MetroPCS New York, LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 419 (S.D.N.Y. 2010).

## BACKGROUND

### A. Factual Background

The following facts are drawn from the parties' Local Rule 56.1(a) Statements and are uncontested unless otherwise noted.[2]

#### 1. Crown Castle's Operation

Crown Castle is a telecommunications provider that transports its customers' communications (voice and data) over fiber-optic lines between points designated by their customers without altering the content of the communications. (ECF No. 31-1 at ¶ 2.)[3] Crown Castle's current and potential customers in the Town, such as Verizon Wireless ("Verizon"),[4] are retail providers of wireless telecommunications services, including cellular service, that are seeking to expand their services in the Town. (*Id.* at ¶ 3.) Crown Castle asserts – and it is

---

[2] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Report and Recommendation means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may cite directly to an underlying document. The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal. *See Stewart v. Fashion Inst. of Tech.,* No. 18-cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03 Civ. 2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). Further, to the extent a party improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party, and does not specifically controvert such facts, the Court disregards those statements. *See McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

[3] Crown Castle holds a Certificate of Public Convenience and Necessity ("CPCN") as granted by the Public Service Commission in the State of New York in 2003. (*Id.* at ¶ 1.)

[4] Verizon Wireless is a commercial wireless communications service provider licensed by the FCC to provide mobile personal wireless services throughout the Town and surrounding areas. (*Id.* at ¶ 6.)

disputed that – "Verizon currently has significant gaps of wireless service[5] in its 4G LTE technologies in the Town, and Crown Castle's 23 proposed facilities in the Town would fill those gaps." (*Id*. at ¶ 4.) In contrast, Defendants assert that according to the review letter prepared by the Town's Wireless Consultant, the Center for Municipal Solutions ("CMS") (ECF No. 29-92), documentation provided to the Town by Crown Castle does not support Crown Castle's contention that there are significant gaps of wireless service within the Town. (*Id*.)

Verizon has historically operated three wireless technologies: CDMA (2G), CDMA2000 (3G) and LTE (4G). (*Id*. at ¶ 5; ECF No. 29-7.) Verizon's 2G & 3G networks have been retired and are no longer operational in and around the Town. (*Id*.) Long-Term Evolution (LTE) also known as (4G) is the current technology standard and 5G will ultimately expand the LTE technology. (*Id*.) In order to remedy what Verizon viewed as a "significant gap in service," Verizon contracted with Crown Castle to design and develop a distributed antenna system ("DAS" or the "DAS system") consisting of small wireless facilities ("SWFs") that will provide reliable LTE service as well as work within Verizon's existing network of facilities. (*Id*. at ¶ 6, 15.) These SWFs would be a part of Crown Castle's DAS network, which is in turn used by Verizon to provide personal wireless services in and around the Town. (*Id*.)

One alternative to the DAS system that Crown Castle uses to implement residential LTE service over large geographic areas are "macro sites," which are towers or structures ranging in 120' to 180' in height that can serve a large geographic area and many customers from a single

---

[5] A gap in service, according to Crown Castle's expert, means that "Verizon Wireless has an area in which, due to either an inadequate radio frequency signal strength, signal quality or inadequate radio frequency signal capacity, it is not reliably able to provide wireless service to customers inside buildings." (ECF No. 29-7 at 4.)

location. (*Id*. at ¶ 7.)  Unlike macro sites, the DAS system is subject to certain limitations, as explained by Crown Castle:

> DAS is a method whereby the base station equipment, that typically is mounted at the base of a tower or other location, is located several miles away. The radio frequency ("RF") signals from the base station equipment are converted to light utilizing fiber-optic technology and transported to the desired area via fiber-optic cables. The information is then connected to remote node equipment located on utility poles in the public right-of-way ("ROW"), which converts the light back to RF and emits from small antennas located on or above the utility pole. This type of design relies on a series of fiber-interconnected utility poles in order to provide continuous coverage and capacity.

(*Id*. at ¶ 7.)

To implement the DAS system, Crown Castle must investigate the utility pole infrastructure within the public right of way or ROW to determine the availability of an existing utility pole for attachment of DAS equipment and antenna. (*Id*. at ¶ 10.)

## 2.  Previous Permit Applications to the Town and the 2017 Litigation

In mid to late 2016, Crown Castle sought to install SWFs on new wooden poles in the ROW by filing 24 applications along with construction drawings detailing the proposed equipment, including antennas, cables, and equipment shrouds, with the Town (the "2016 Applications"). (*Id*. at ¶ 21.)  After Crown Castle agreed to relocate half of the SWFs and lower the height of each SWF at the request of the Town, the Town issued 22 out of the 24 highway permits.[6] (*Id*. at ¶ 23.)  However, in May 2017, the Town revoked the permits and declared a complete ban on wireless telecommunications facilities in the ROW due to the residents' unfounded concerns regarding the environmental effects and health risks from radio frequency

---

[6] The permits issued by the Town's Highway Department permitted Crown Castle to open the right-of-way but were not building department permits to construct wireless facilities. (*Id*. at ¶ 24.)

emissions. (*Id*. at ¶ 24.)  During a May 9, 2017 Town Board Meeting, Town Supervisor Joseph Saladino stated, in relevant part:

> [W]e are going to stop providing any right to them to enter town property as of this moment forward, which we may end up with them taking action because the companies who install these have not allowed the town any input to their location, they have not given any consideration to the residents, neighborhoods, the fact that these are near our children and we're putting a stop to it. We will stop providing them with permits while the company that installs them gives us no right, gives us no interaction to decide where they go. I just want to make this absolutely clear, under this administration . . . going forward, we are to stop providing the right of way for cell companies to install repeaters[.]

(*Id*. at ¶ 25.)

In response to the Town's revocation of highway permits, Crown Castle commenced an action against the Town (the "2017 Litigation") asserting causes of action for, *inter alia*, violations of the TCA. (*Id.* at ¶ 26.) The Town claimed that between May 1, 2017, and August 27, 2018, the Town issued building permits for thirteen wireless communications structures, and, based upon the Town's claim, the Court held that a *de facto* moratorium on the issuance of wireless communications structure permits did not exist. (*Id.* at ¶ 29-30.) Ultimately, the Court did not render a decision on the merits in the 2017 Litigation, but rather dismissed the action for lack of subject matter jurisdiction on the ground that the claims were not ripe because Crown Castle did not apply for – and the Town did not deny – the requisite building and special use permits. (*Id.* at ¶ 32) (citing *Crown Castle NG E. LLC v. Town of Oyster Bay*, No. 17-CV-3445(SJF)(ARL), 2020 WL 2393915, at *2 (E.D.N.Y. May 12, 2020)).

### 3.  The Town's Wireless Telecommunications Facilities Ordinance

On September 12, 2017, the Town adopted Local Law No. 6-2017, which enacted Ch. 242, entitled "Wireless Telecommunications Facilities" (hereafter, "Ch. 242") (*Id.* at ¶ 33.) Ch. 242 requires that an applicant seeking to site, place, build, construct, modify or prepare any site

for the placement or use of wireless telecommunications facilities must obtain a building permit

from the Town Department of Planning and Development ("P&D"), pursuant to Ch. 93, and a

special use permit from the ZBA, pursuant to Ch. 246. (*Id.* at ¶ 35.) Ch. 242 also requires that all

applications for a special use permit for the installation of a new wireless telecommunication

facility shall contain:

> (i) documentation that demonstrates and proves the need for the wireless telecommunications facility to provide service primarily and essentially within the Town;
> (ii) a full statement and substantive explanation to show that pursuant to a study undertaken by the applicant employing due diligence, the proposed placement site is justified, in that alternate placement sites, co-location sites, or other alternate methods, which would have a lesser negative effect on area character, property values and aesthetics than the selected site would be technically unfeasible, commercially impracticable, or otherwise inappropriate; and
> (iii) a demonstration that the facility will be sited so as to minimize visual intrusion as much as possible, given the facts and circumstances involved, and will thereby have the least adverse visual effect on the environment and its character and on the residences in the area of the new wireless telecommunications facility.

(*Id.* at ¶ 36.)

Under Ch. 242, the P&D reserved the right to retain third-party agencies or expert

consultants to accept, review, and analyze all incoming permit applications, and make

recommendations to the P&D, the ZBA, and any other involved agency or department of the

Town with respect to those applications. (*Id.* at ¶ 36.) Shortly after the Town adopted Ch. 242,

Commissioner Maccarone determined that the Town would utilize an outside consultant, Richard

Comi ("Comi") of CMS to review "all telecommunications applications." (*Id.* at ¶ 43.) Comi

testified that he views himself as a "an expert in the area of siting of wireless facilities[,]" but is

not is not an engineer, architect or a municipal planner. (*Id.* at ¶ 44.) Comi submits invoices to

the Town for CMS's review of telecommunications applications. (*Id.* at ¶ 45.) CMS charged the

Town $19,214.52 in connection with its review of the Applications. (*Id.* at ¶ 55.) Notably, the

Town's review of the applications for proposed SWFs is subject to a shorter 60 to 90 day shot clock (*i.e.*, the time the municipality has to review and render a decision on an application) than a review of an application for the construction of a macro site, being 90 to 150 days. (*Id*. at ¶ 16.)

Pursuant to Ch. 242, an applicant for the installation of a wireless telecommunications facility in the ROW is required to pay the following fees: (i) $100 application fee for each building permit application; (ii) for the installation of a new DAS node on an existing structure, $650/node if outdoors and $450/node if indoors; (iii) for the installation of a new DAS node on a new freestanding structure, $900 if outdoors and $700 if indoors; (iv) $200 per commercial wi-fi node; (v) $550 ZBA application fee for each special permit application; and (vi) a $2,000 Highway Department permit application fee *per pole* utilized for a wireless antenna[7] (*Id*. at ¶ 50-51.)

Applicants are also required to pay an initial escrow fee in the amount of $8,500 per application and, if the balance of the trust account decreases to less than $2,500, the applicant must replenish said escrow account so that it has a balance of at least $5,000. (*Id*. at ¶ 52.) The Town "did not at any time prior to its adoption of the application fees and escrow structure for wireless applicants through the present date perform any studies to determine the reasonableness of such fees." (*Id*. at ¶ 59.)

In compliance with the fees set forth in Ch. 242, Crown Castle paid a total of $210,450, including $195,500 in escrow fees, and $14,950 for the building permit application fees and

---

[7] Defendants dispute the fact that the Highway Department permit application fee *per pole* utilized for a wireless antenna is $2,000. (*See* ECF No. 31-1 at ¶ 54.) However, Ch. 242, Section 242-16(E), "Fees" explicitly provides: "[t]he fee to be paid to the Highway Department for any application [for permits for wireless facilities in public streets or ROWs] shall be $2,000 per pole utilized for a wireless antenna." (ECF No. 29-15 at 5.)

ZBA fees associated with its 23 permit applications made in 2020. (*Id*. at ¶ 53.)  Accordingly, upon special permit approval to install 23 SWFs within the public ROWs, Crown Castle would have had to pay an additional $46,000 for highway permits and an additional $19,950 to obtain building permits, increasing Crown Castle's total cost for the SWFs to $276,400. (*Id*. at ¶ 54.)

### 4. **Crown Castle's 2020 Permit Applications**

On July 27, 2020, following the dismissal of the 2017 Litigation and the enactment of Ch. 242, Crown Castle submitted 22 applications for building permits to install its SWFs on existing or new utility poles in the ROW (hereafter, the "2020 Permit Applications" or the "Applications")[8] and requested that the Town waive the need for special use permits. (*Id*. at ¶ 63.) Between August 4 and 6, 2020, the Town returned the 2020 Permit Applications due to alleged deficiencies to Crown Castle, to "resolve the deficiencies and resubmit the applications." (*Id*. at ¶ 64.) On August 12, 2020, Crown Castle supplemented and resubmitted the 2020 Permit Applications with the information requested by the Town and twenty-two (22) checks, each in the amount of $8,500, to establish an escrow account for each of the Applications. (*Id*. at ¶ 66.) On August 18, 2020, the Town again returned the Applications due to alleged deficiencies with the Applications. (*Id*. at ¶ 67.)

On September 2, 2020, Crown Castle and the Town performed site walks of each of the proposed facilities. (*Id*. at ¶ 68.) Comi did not attend the site walks or otherwise visit any of the locations of the proposed SWFs. (*Id*. at ¶ 69.) Following the site walks, Crown Castle agreed, at

---

[8] The term "Applications" includes an additional two applications that Crown Castle submitted to the Town on September 14, 2020, and twenty-three applications that Crown Castle submitted to obtain special use permits on February 23, 2021, but does not include one application for a proposed SWF that Crown Castle withdrew after agreeing to the Town's request to relocate the SWF to the Nassau County ROW. (*Id*. at ¶ 63, Fn. 5.)  In total, Crown Castle requested 23 SWFs in the ROW as part of the Applications. (*Id*.)

the request of the Town, to specific design and equipment configurations at four of the proposed SWFs and agreed to the relocation of three proposed SWFs to alternative locations in the ROW, and the elimination of one SWF from the ROW that would be relocated to the Nassau County ROW. (*Id*. at ¶ 70.) On September 14, 2020, Crown Castle resubmitted the Applications, addressing each of the deficiencies alleged by the Town, and submitted two additional Applications, two additional escrow checks, each in the amount of $8,500, and two additional checks each in the amount of $100 for the building permit application fee. (*Id*. at ¶ 72.) On September 23, 2020, the Town again deemed the Applications "incomplete." (*Id*. at ¶ 73.)

Between September 24, 2020 and October 20, 2020, Crown Castle: (i) amended seven of its Applications by submitting revised plans incorporating the agreed-upon design and equipment configurations and revised plans, structural analyses, expert radio frequency ("RF") exposure reports and radius maps for the alternative locations requested by the Town; and (ii) withdrew its application for the proposed SWF that Crown Castle agreed to relocate to the Nassau County ROW at the request of the Town. (*Id*. at ¶ 74.)

On October 21 and 22, 2020, the Town informed Crown Castle that the Applications were in order but would not be processed by the Town until Crown Castle entered into a Right-of-Way Agreement ("RUA") with the Town. (*Id*. at ¶ 75; ECF No. 29-1.) On November 13, 2020, the Town performed its initial processing and advised Crown Castle to file the Applications electronically with CMS. (*Id*. at ¶ 78.) On December 31, 2020, Crown Castle requested that the Town confirm whether it wished to enter into a RUA with Crown Castle and if it intended to process the 23 Applications that were requested by the Town and filed by Crown Castle. (*Id*. at ¶ 79.) The Town responded that "in view of the overall procedural and substantive posture of the case, the matter must be reviewed and carefully considered by the entire Town

10

Board before they can direct the Building Department to refer the matter to the Zoning Board pursuant to the negotiated settlement[,]" and as of that date, the Town was "not prepared to proceed with the contemplated settlement." (*Id*. at ¶ 79.) On January 7, 2021, Crown Castle submitted a third request that the Town confirm whether it wished to enter into a RUA. (*Id*. at ¶ 80.)[9]

On January 13, 2021, Crown Castle made a fourth request to the Town, directly to Commissioner Maccarone, to confirm whether a RUA was mandated under the Town Code or any other lawful requirement, and additionally requested the Commissioner confirm: (i) whether the Town was refusing to process the Applications because Crown Castle was not a party to a RUA with the Town; (ii) whether site plan approval is required, and if so, whether it has been completed by the Town; and (iii) her determination as to Crown Castle's request for a waiver of the need to obtain special permits in connection with the Applications, pursuant to Sections 242-5 and 242-24 of the Town Code. (*Id*. at ¶ 80.) On January 15, 2021, Joseph Macy, special counsel for the Town (the "Town's Special Counsel"), notified Crown Castle that its request for a waiver of the special use permit requirement was denied because "the issuance of the special use permit is within the authority of the ZBA, and the Town will not supplant that authority." (*Id*. at ¶ 83.) On January 19, 2021, in response to an email from Crown Castle's attorneys to the Town's Special Counsel, the Town's Special Counsel informed Crown Castle:

> The Town has advised us that at this time it considers the negotiation of a right-of-way use agreement to be premature. At such time as Crown Castle's application is deemed complete and the application for a special use permit is considered by the Board of

---

[9] Defendants do not contest the fact that Crown Castle submitted a third request that the Town confirm whether it wished to enter into a RUA on January 7th, however, Defendants state that "without completed applications and consideration by the ZBA, negotiation of a RUA was considered to be premature by the Town." (ECF No. 31-1 at 80.)

Zoning Appeals relating to each of the pending applications, the Town will negotiate an agreement with the applicant.

(*Id*. at ¶ 81.)

Back on December 1, 2020, pursuant to discussions with counsel for the Town, and in further support of its Applications, Crown Castle submitted a supplemental radio frequency or RF letter, dated December 1, 2020, and report confirming that the three relocated SWFs will still substantially cover the gap areas as originally intended. (*Id*. at ¶ 85.) In response, the Town's Special Counsel and Comi acknowledged:

> Verizon Wireless has a gap in in coverage in the 2100 Mhz. frequency band throughout the subject area. The 2100 Mhz. frequency band is one of four frequency bands (700, 850, 1900 and 2100 Mhz.) licensed to and utilized by Verizon Wireless to provide wireless services. While the frequency bands are capable of operating independently, modern wireless services utilize all four frequencies, as needed, in order to provide telephone and data services to meet both coverage and capacity requirements. We note that the Report provides data in the 2100 Mhz. range and contains minimal reference to the other frequency ranges. Whether the demonstrated lack of coverage in the 2100 Mhz frequency range, standing alone, is adequate for the Town's Zoning Board of Appeals to conclude that the applicant has established a need for the service under Sec. 242-5(H)(1) is an issue for the Board to determine upon this application.

(*Id*. at ¶ 86; ECF No. 29-8.) With respect to the aesthetic requirements of Ch. 242, the Town's Special Counsel and Comi further acknowledged:

> Section 242-5(N) does not require that wireless facilities be invisible only that they "harmonize" with the surrounding area. To achieve this goal, there are a variety of methods utilized by wireless providers to minimize the visual impact of these facilities. As evidenced by the lack of community complaints received during this time, the existing facilities have blended into the surrounding communities and therefore, do not appear to be any more visually intrusive, and potentially less so, than alternative stealth designs. From this, it is for the [ZBA] to determine whether the proposed sites meet the requirements of Sec. 242-5(N).

(*Id*. at ¶ 88; ECF No. 29-8.) On December 7, 2020, pursuant to additional discussions with the Town's Special Counsel, and in further support of its Applications, Crown Castle submitted a second supplemental RF letter and a declaration from its expert, Richard Conroy ("Mr. Conroy or "Conroy") of PierCon Solutions, LLC ("PierCon"), that included drive test data at 850 MHz

12

and key performance indicator ("KPI") data (i.e., drop call failure rate and call access failure rate). (*Id*. at ¶ 89; ECF No. 29-80.) Mr. Conroy found, in relevant part, "all of Verizon's licensed bands have inadequate service within the area of the 24 DAS nodes, there is a significant gap in service [with respect to its 850 MHz 3G band and in its 700 MHz and 2100 MHz LTE bands] that the DAS nodes will remedy, and without the DAS nodes both Crown [Castle] and Verizon will be materially inhibited from providing service." (*Id*.)

Comi reviewed the first and second supplements submitted by Crown Castle, which the Town considered to be a part of the Applications, and subsequently informed Crown Castle that as of January 14, 2020, the Applications remained incomplete because "Crown Castle has not proven the need for the SWFs, [t]he material submitted has not addressed the visual impacts to the surrounding neighborhoods, and [t]he Applications fail to employ stealth and/or concealment technology as required by the Town Code" (*Id*. at ¶ 91; ECF No. 29-83), and recommended the Applications be forwarded to the ZBA for their review and determination (*Id*. at ¶ 93.) The Town adopted Comi's recommendations (*Id*. at ¶ 92), and issued a Notice of Rejection for each of the Applications, advising Crown Castle that it must file special use permit applications with the Zoning Board of Appeals as required by Ch. 242, Section 5(a). (*Id*. at ¶ 94.)

On February 23, 2021, Crown Castle filed special permit applications, highway permits, and revised drawings, and the required ZBA applications fees with the Town. (*Id*. at ¶ 95-96.) In support of its special permit Applications, and in accordance with Ch. 242, Crown Castle submitted: (i) a March 18, 2021 Report from Mr. Conroy, which states that Conroy "utilized actual drive test maps, calculated coverage maps, and key performance indicators to scientifically and reliably demonstrate Verizon Wireless's significant gap in service in accordance with accepted industry methodology and standards," (the "2021 Conroy Report")

13

(ECF No. 29-7), along with signal propagation and drive test data and maps, and KPI data including dropped call rates and utilization capacity charts; (ii) the "Doon Report;"[10] and (iii) a pole justification report prepared by a Senior Network Permitting Specialist, Paul Costa (the "Pole Justification Report")[11]. (*Id*. at ¶ 97-98.)

Based upon his analysis of the data, Mr. Conroy concluded that the "SWFs [were] necessary to increase coverage and capacity in order to provide reliable service over a nearly five square mile portion of the Town in which approximately 10,000 individuals reside." (*Id*. at ¶ 99.) Specifically, Conroy concluded that the "signal propagation and drive test data and maps demonstrate that significant gaps in service exist over various frequencies using different technologies in the Town, including 3G and 4G LTE, through which Verizon Wireless provides personal wireless services and that the SWFs would fill these gaps" (*Id*. at ¶ 100), and that "the KPI data demonstrated that Verizon's 4G LTE network is not able to provide reliable service due to the significant gaps in the area." (*Id*. at ¶ 101). The Conroy Report also showed the "drop call rate" in the areas of the proposed nodes "not only exceeded the 1% threshold [*i.e.*, the "industry standard" used by Verizon to measure dropped calls] but in fact far exceeded it throughout the data-collection period[,] with maximum dropped call rates ranging from 8% to 50%, 7% to 24%, and 4% to 16% in the various Crest Hollow (Woodbury), Syosset, and South Massapequa Polygon sectors, respectively." (*Id*. at ¶ 138.)

---

[10] The Doon Report is a Planning, Zoning, and Environmental Impact Assessment prepared by Nancy Doon, a certified planner with more than twenty-four years of experience, which concluded that "the SWFs conform with the Ch. 242 requirements, there [were] no feasible alternatives to the SWFs that are higher on the Town's order of priority, and the SWFs would not result in significant aesthetic or visual impacts or alter the primarily residential land use setting." (*Id*. at ¶ 106.)

[11] The Pole Justification Report concluded that "there were no feasible less intrusive locations in the ROW" for Crown Castle to place the SWFs. (*Id*. at ¶ 105.)

14

Conroy additionally evaluated existing macro sites and other structures within the Town and concluded that all existing sites are located too far from the area of the SWFs to provide reliable service and that it was not feasible to construct these new towers due to the dense residential nature of the area. (*Id*. at ¶ 103). A public hearing was held on March 25, 2021 and May 20, 2021 before the ZBA to consider Crown Castle's Applications. (*Id*. at ¶ 134; ECF No. 29-107; ECF No 31-3.).

At the March 25, 2021 hearing, Crown Castle enlisted Mr. Conroy to discuss the need for the facilities tests performed by him and propagation maps, as well as several other experts to testify in support of its Applications. (ECF No. 29-107 at 3.) Crown Castle's experts explained the Applications were for DAS SWF nodes within the ROW in Massapequa, Woodbury, and Syosset. (*Id*.) Crown Castle described this equipment as "being camouflaged to blend in with the wood utility poles and surrounding areas [,]" with the camouflaging "being intentionally selected based on the character of these communities." (*Id*. at 3-4.)

When addressing the issue of alternative placement sites for nodes, Crown Castle claimed that most of the existing utility poles are unusable because "they contain certain utility equipment such as electrical transformers, power boxes and junctions that prevent the use of these poles for new equipment" (*Id.* at 4), and therefore, "new poles would have to be placed in the ROW." (*Id*.) The ZBA reported these poles would lie "directly in from of residents' homes and windows." (*Id.* at 5.) The ZBA reported that "no alternatives were presented" at the hearing. (*Id*.) Specifically, the ZBA reported that "[Crown Castle] claims that given the dense residential character of the area, there were no suitable existing towers or structures to meet the coverage need." (*Id*. at 5.) The ZBA stated that "no support was given for these claims  . .. [and] [n]o alternate materials, colors or technology was presented." (*Id*.) The ZBA further reported that

15

Crown Castle presented "another expert as having prepared the RF engineering[,]" and the expert noted that Verizon is licensed by the FCC to operate their network, they have an existing LTE network, and LTE "is the current technology where they want to enhance coverage and intensify coverage in the area with the installation of the[] 23 DAS nodes." (*Id*. at 5.) The ZBA noted that "no evidence was presented as to efforts to locate macro sites or any advance in technology to enhance existing macro sites." (*Id*. at 6.)

At the hearing, Town residents, professionals from the industry, and attorneys[12] spoke in opposition to the Applications – several stating that the purpose of the Applications was "to create the illusion of a need for wireless service where the real intention was to sell streaming and data service in the future." (ECF No. 29-107 at 9.) Residents additionally noted that they have Verizon service and did not experience any drop calls in their communities. (*Id*.) Several of the ZBA Board members spoke of their own experiences as elected officials and their history with Town residents having never heard of complaints of dropped service in the areas of the proposed nodes. (*Id*.) Crown Castle explained that this was a matter of Verizon designing their network and trying to "fulfill capacity objectives in those specific areas because they do not have access to facilities." (*Id*. at 7.) Crown Castle further claimed: (i) no macro sites can provide coverage range into these areas, and (ii) Verizon is "continuously designing their networks" and

---

[12] The ZBA noted that one attorney testified at the March 25, 2021 hearing that at other hearings, the standard for measuring dropped calls was a 98% drop rate, and noted that by "creating their own standard" Verizon "got to create their own need." (*Id*. at 9-10.) The attorney's opposition included coverage maps that Verizon provides on its own website so that consumers can judge the reliability of their service. (*Id*.) He specifically provided a map for Calvert Avenue, which "showed complete coverage." (*Id*.) The ZBA stated that the attorney's presentation "clearly shows that Verizon is either being disingenuous with the Board by claiming that their coverage is incomplete or is being disingenuous with the consumer public with a map showing coverage." (*Id*.)

has "internal data to see where calls are dropping." (*Id*.) Crown Castle's experts explained at the hearing:

> [W]hen dealing in areas void of coverage or any area that may have a covered signal but is no longer able to support the user traffic, or the capacity, there is a gap. There are two components here, coverage and capacity. Coverage is just the ability to provide signal to the area and then capacity is the ability to support the user traffic. [If] either of those is not maintained service is out of balance and you're going to have an unreliable network with dropped calls and a gap in coverage. [T]o visualize a coverage perspective[,] one should note fully concentric circles with 700 MHz being the widest concentric circle, 850 MHz being smaller, 1900 smaller yet and the 2100 the smallest concentric circle. Now as users are accessing the cell tower of a macro site and are close to the center of that site[,] they have access to all of the capacity of the site. They're going to start losing the ability to communicate as they get to the outside edge, which would result in a degrading of the signal quality.

(*Id*.)

Crown Castle's experts claimed the 23 proposed nodes "worked to take the traffic off macro sites" and "attempt[] to fill gap coverage and densify [*i.e*., provide coverage to and increase the capacity of] [Verizon's] network and improve [its] service capabilities in the area." (*Id*.) They argued "technical standards, network design and performance characteristics are established by [Verizon] and not by the local government." (*Id*. at 7.) The ZBA noted that Crown Castle performed "drive tests" and examined "key performance indicators[,]" including "dropped call rates and utilization capacity charts that demonstrate network capacity." (*Id*. at 8.) The ZBA further noted that the "drive test purportedly shows that the macro sites cannot provide any signal at the 1900 MHz frequency band to provide coverage in these areas" and exhibits submitted by Crown Castle "show[ed] that 1900 is not propagated from the nodes nor can the coverage from the existing macro sites provide signal to the areas." (*Id*.)

However, the ZBA stated that "[a] key point of [Crown Castle's] presentation was that the dropped call rate metric is 1%[,]" which a Crown Castle expert testified "is not just a Verizon

standard" but rather "an industry standard" – and, that "if dropped calls exceed 1%[,] its not a reliable network." (*Id*.)  That is, the drop call rate must be less than 1% to constitute a reliable network, according to Crown Castle's expert. (*Id*.) Crown Castle's expert further explained that "coverage was lacking from the macro sites which can't reach these areas" and that DAS nodes "were needed to support the capacity." (*Id*.) The ZBA noted that when it questioned Crown Castle's expert regarding the dropped call rate metric, the expert claimed Verizon has "established that a dropped call rate greater than 1% is a measure of unreliable wireless coverage[,]" which, in the expert's opinion, "is a reasonable criteria" and "industry standard." (*Id*.) The ZBA noted that this standard "comes from landline telephone systems which are looked at for call dropping" and that it seemed "absurd" to "use a landline telephone drop rate as a comparison to cellular service." (*Id*. at 9.)

On June 21, 2021, the Town issued a review of Mr. Conroy's findings, in which Mr. Comi determined that the Applications were "incomplete because Crown Castle did not prove the need for the SWFs, and as a result, the ZBA never reached the issue of either intrusive locations and/or designs" (the "June 2021 Review Letter"). (*Id*. at ¶ 114; ECF No. 29-92). Comi acknowledged that the 2021 Conroy Report contained KPI data demonstrating that over a 90-day period the downlink utilization exceeded the 70% utilization metric 56% of the time, noting a significant gap in service; however, Comi claimed that to confirm actual capacity needs, other data like "bit call rate" must be provided. (*Id*. at ¶ 116.) Mr. Comi additionally posed several questions regarding the data and findings contained in the 2021 Conroy Report, including Verizon's design criteria metrics. (*Id*. at ¶ 115.) Mr. Comi did not put forth nor collect any data of his own to dispute Mr. Conroy's findings. (*Id*.)

Specifically, the June 2021 Review Letter states that "site visits were conducted with Town Officials, to view the locations for the proposed DAS nodes" – "[a]ll twenty-three (23) locations are within residential neighborhoods of Massapequa, Woodbury and Syosset." (ECF No. 29-92 at 2.) With respect to the Woodbury area, Comi notes: "2100 MHz LTE on air macro coverage map and on air drive test data shows several of the proposed nodes in areas where there appears to be reliable service[;]" (ii) "1900 MHz LTE on air macro coverage with on air drive test data shows that Node N633 appears to have reliable service[;]" (iii) "850 MHz LTE macro coverage shows several of the proposed nodes in areas where there is reliable service[;]" (iv) "700 MHz LTE on air macro coverage and on air drive test data shows all of the proposed nodes in this area to be located in areas where there is reliable coverage." (*Id*. at 3.)

With respect to the Syosset area, Comi notes: (i) "2100 MHz LTE on air macro coverage with on air drive test data shows that two (2) of the four (4) proposed node locations are in areas where there is reliable service . . . [Crown Castle's map] does not show drive test data for several of the existing on air DAS nodes in this area, and does not show signal propagation from any of the existing on-air nodes[;]" (ii) "1900 MHz LTE on air macro coverage with on air drive test data shows that one of the proposed node locations is in an area that also has reliable service[;]" (iii) 850 MHz LTE macro coverage shows all four (4) node locations in this area to be at locations where there is reliable service[;]" and (iv) 700 MHz LTE on air macro coverage with on air drive test data shows all four (4) node locations in this area to be at locations where there is reliable service." (*Id*. at 3-4.)

With respect to the Massapequa area, Comi found: "700 MHz LTE on air macro coverage with on air drive test data shows that all four (4) proposed node locations are in areas where there is reliable service . . . [Crown Castle's map] does not show drive test data for many

of the existing on air DAS nodes in this area, and does not show signal propagation from any of the existing on-air nodes." (*Id.* at 4.) Overall, Comi concluded that the maps provided by Crown Castle were "incomplete," in that "[t]hey did not show drive test data for many of the existing on air DAS nodes and do not show signal propagation from any of the existing on-air nodes . . . [and] many of the proposed node locations are in areas that already have reliable service." (*Id.*) Comi additionally noted that "material provided only shows drop call rate to determine site capacity. Verizon uses a 1% drop call metric, which is a self-determined standard by Verizon. No documentation or data has been provided to justify the 1% objective." (*Id.* at 5-6.)

On July 1, 2021, Crown Castle advised the Town that it intended to respond to the June 2021 Review Letter by early August 2021. (ECF No. 31-1 at ¶ 120.) That same day, the Town acknowledged Crown Castle's intent to respond and advised Crown Castle that the ZBA would need to have Crown Castle's reply in hand no less than 7-10 days prior to Crown Castle's upcoming September 9, 2021 hearing before the ZBA. (*Id.* at ¶ 121). On August 6, 2021, thirty (30) days prior to the ZBA hearing, Crown Castle submitted to the ZBA, and the ZBA received, nearly 1,400 pages of supplemental materials in support of its Applications, including a letter from Mr. Conroy, dated July 30, 2021, responding to the questions posed by Mr. Comi in the June 2021 Review Letter (the "Conroy Response Letter") (*Id.* at ¶ 122-123; ECF No. 29-96.)

With respect to Comi's comments on reliable service in the area of the proposed nodes, the Conroy Response Letter states, in relevant part:

> The existence of some signal in and around the 23 proposed DAS nodes is expected as there are a number of DAS nodes operating, particularly in the 700 MHz band, in the area. A heterogeneous network (network of large macro sites combined with small cell DAS nodes) design requires that the small cell DAS network overcome the surrounding macro signal thereby transferring users off the macro sites and onto the small cell DAS polygon coverage area. This is achieved through dense node placements and a design that ensures a 10 dB greater signal than the surrounding macro network coverage. This is the

reason why the 23 proposed DAS nodes, part of a larger system of DAS nodes, are required. The exhibits prepared by [Conroy] demonstrate that there is not sufficient signal in the area of the 23 proposed DAS nodes . . . [and] it is not sufficient for Verizon to have only 700 MHz coverage and not 2100 MHz coverage. If there is a gap in 2100 MHz signal there is a significant gap in service and Verizon is therefore materially inhibited and limited from providing its services.

(ECF No. 29-96 at 1.) Regarding Comi's comments on the 1% drop call rate, Conroy stated:

The 1% drop call metric is an industry standard that has been in use since the original cellular system of the 1980s. The metric demonstrates that the adjacent macro site is not providing reliable service at the 700 MHz band. [P]art of the DAS design criteria is to overcome the macro signal to offload traffic from the macro and onto the DAS polygon coverage. The lack of contiguous DAS polygon coverage is causing unreliable service from the macro network.

(*Id*. at 8.) Conroy concluded that:

The 23 proposed nodes are part of a larger small cell network that is already in operation. For example, Woodbury contains 15 proposed nodes out of 32 operating in the Woodbury polygon, Syosset contains 4 proposed nodes out of 13 operating in the Syosset polygon, and South Massapequa contains 4 proposed nodes out of 45 operating in the South Massapequa polygon. Since a majority of the DAS nodes are operating there is a certain level of LTE coverage in the area. However, as illustrated by the drive test data provided, there is a lack of in-building LTE service, particularly in the 2100 MHz frequency band, in and around the 23 proposed DAS nodes. Furthermore, these nodes are necessary to complete the DAS design for each polygon. The DAS nodes operating at 700 MHz and 2100 MHz are necessary to provide the in-building LTE levels of service. Without the 23 nodes, Verizon will be materially inhibited and limited from providing its services.

(*Id*. at 10.)

On September 9, 2021, the ZBA held a public hearing and vote on the Applications. (*Id*. at ¶ 126; ECF No. 29-106.) Prior to the final vote by ZBA board members, ZBA Board Member Lewis Yevoli stated at the hearing:

With all due respect, and I must have sat on thousands of Zoning applications as Councilman, Supervisor, Chairman of the Planning Commission, now the Zoning Board of Appeals. I cannot remember one instance where the applicant didn't portray it as there has to be a need for what they are looking to have approved. In this particular case, we have not had one individual in any of the areas where these towers being proposed indicate to the Town Board that there is a need for this. They used the term dropped calls which basically means that you don't have the service that is necessary to make calls at

times. That is never been proven in this application. It's alluded to but it's never proven. Again, I kept looking for somewhere where it would indicate that there is a true need for these towers to be placed where they are, because again, no one has reported any dropped calls. I think that becomes absolutely critical to this application.

(ECF No. 29-106 at 3-6.) Board Member Rebecca Alesia stated:

[W]hen we attempted to encourage [Crown Castle] to provide us with specifics for the need, the number we were given was somewhere under one percent of calls are being dropped. When one of my colleagues inquired where that number [came] from . . . [and] [if Verizon] receive[d] a number of dropped call signals . . . [Crown Castle] couldn't answer that question.

(*Id*. at 7-8.) Board Member Andrew Monteleone stated:

I don't think [Crown Castle] established, in any way, a need for these things. There needs to be establishment that there is a gap in coverage. They tried to say there was and tried to say they proved it by showing drive test data, which we later found out through questioning was actually not drive test data but their interpretation of drive test data. When we further questioned them with regard to we want the actual data, their response was we can give you reams and reams of paper but these are the numbers. So that in of and itself to me fails to establish any sort of gap in coverage. There is no problem to solve.

(*Id*. at 8-11.) The Board unanimously voted to deny the Applications at the conclusion of the hearing. (*Id*. at 29.) Following the hearing, on October 15, 2021, the ZBA issued a 20-page written denial of the Applications, which, Defendants claim, the ZBA "based upon the submissions and testimony at the March 25, 2021, hearing, the June 2021 Review Letter, and the supplemental submissions by Crown Castle."[13] (*Id*. at ¶ 134.) Specifically, the ZBA reiterated the June 2021 Review Letter findings and commented on the March 25, 2021 hearing, ultimately concluding:

[Crown Castle] ha[d] failed to show and prove the need for the wireless telecommunications facility to provide service primarily and essentially within the Town. The Board found that the applicant failed to prove a gap in coverage. As noted by the

---

[13] It is undisputed that that the September 9, 2021 ZBA hearing Transcript contains no mention of any supplemental materials submitted by Crown Castle (ECF No. 31-1 at ¶ 131), and members of the ZBA admittedly "couldn't go through every page [of the hundreds and hundreds of pages], particularly the technical part" that was "well beyond [their] scope of intelligence" and which "no one can possibly understand unless . . . you're Wernher von Braun or Albert Einstein or Enrico Fermi." (*Id*. at ¶ 28.)

Towns expert the submission was insufficient. As noted by the Board, the applicant did not provide raw data and only supplied their interpretation of data to reach the self-created standard of 1% dropped calls. No evidence was produced as to an industry standard. No explanation was provided as to why this drop rate was only existing in these areas of the township. The applicant has provided no evidence as to the availability of macro sites or their efforts to obtain new sites or enhance existing macro sites. There was no testimony of a need by residents and the coverage maps of Verizon contradict the very application they are making. Isolated "dead spots" or de minimums areas of non-coverage do not amount to a significant gap. [Crown Castle] has failed to show and document that the proposed work will maximize the use of building materials, colors and textures designed to blend with the structure to which it may be affixed and/or to harmonize with the natural surroundings and the utilization of stealth or concealment technology required by the Town.

(*Id*. at ¶ 136; ECF No. 29-107 at 19-20.)

**B.  Procedural History**

Plaintiff originally filed the Complaint in this action on November 12, 2021. (ECF No. 1). In its Complaint, Crown Castle alleges violations of Sections: (i) 332(c)(7)(B)(iii) ("Count I"); (ii) 332(c)(7)(B)(i)(II) ("Count II"); and (iii) 253(a) ("Count III") of the TCA against Defendants, arising from Defendants' denial of Crown Castle's applications for special permit approval to install 23 SWFs within the public ROWs in and around the Town. (*Id*. at ¶¶ 2, 127, 134, 141). Specifically, Crown Castle alleges Defendants: (i) "imposed unreasonable, excessive, and prohibitive escrow charges and application fees" for special permit approval; (ii) the Town required a ROW use agreement with Crown Castle to implement SWFs, "but refused to execute one[;]" (iii) the Town's municipal code requirements and application review processes "made it impossible to obtain the applications' approval within the 90-day period set forth by the Federal Communications Commission ("FCC") for such applications;" and (iv) the ZBA "unreasonably and without substantial evidence in the written record denied" Crown Castle's 23 applications – resulting in the Town "effectively prohibiting telecommunication services and personal wireless services" in violation of the TCA. (*Id*. at ¶ 2.) Defendants answered the Complaint on January 21, 2022. (ECF No. 14.)  Plaintiff moves for summary judgment with respect to all three Counts

asserted in the Complaint. (*See* ECF No. 29-2). Defendants filed their Opposition to Plaintiff's Motion (ECF No. 30), and Plaintiff filed its Reply (ECF No. 31) on March 10, 2023. By Order dated October 18, 2023, Judge Azrack referred Plaintiff's Motion to the undersigned for a report and recommendation. (*See* Electronic Order dated October 18, 2023.)

## C.  **The Parties' Contentions**

In support of its Motion for Summary Judgment, Crown Castle argues: (i) the Town's denial of its Applications was not supported by substantial evidence in the written record in violation of §332(c)(7)(B)(iii) of the TCA; (ii) the Town's denial of its Applications materially inhibited and effectively prohibited the provision of telecommunications and personal wireless services in violation of §§ 253(a) and 332(C)(7)(B)(i)(II) of the TCA; (iii) the application criteria and review processes set forth in Ch. 242 and imposed upon Crown Castle materially inhibited the provision of wireless services in violation of §§ 253(a) and 332(c)(7)(B)(i)(II) of the TCA; (iv) the fees set forth in Ch. 242 and imposed upon Crown Castle effectively prohibited the provision of wireless services in violation of §§ 253(a) and 332(c)(7)(B)(i)(II) of the TCA; and (v) injunctive relief in the proper remedy for violations of the TCA. (ECF No. 29-2 at 2.)

With respect to Crown Castle's first claim, Crown Castle argues that the Town's denial of its permit Applications is based upon "three patently false claims that are not supported by substantial evidence—that Crown Castle: (1) failed to show a need for the SWFs; (2) failed to consider alternative locations and/or technology; and (3) failed to minimize the aesthetic impacts." (*Id.* at 11.) Crown Castle argues that in accordance with 242-5(H)(1) and in response to requests made by Comi, Crown Castle submitted all forms of data required by the Town Code, including "extensive and unrefuted documentation including signal propagation and drive test data and maps, key performance indicator data including drop call rates and utilization capacity

charts," prepared by Mr. Conroy, "to demonstrate that the SWFs are necessary to increase coverage and capacity in order to provide reliable service over a nearly five-square-mile portion of the Town in which approximately 10,000 individuals reside." (*Id.* at 13.)

Crown Castle states that based upon his analysis of the data, Mr. Conroy confirmed that "significant gaps in service exist over various frequencies using different technologies in the Town, including 3G and 4G LTE, through which Verizon Wireless provides personal wireless services and that the SWFs would fill these gaps[,]" and the Town "did not [otherwise] submit[] any data to dispute Conroy's data and conclusions which clearly established the significant gaps in service and capacity needs that will be remedied by the SWFs, and that without the SWFs, Crown Castle and Verizon will be materially inhibited from providing telecommunications services and personal wireless services." (*Id.*) In addition to Mr. Conroy's findings, Crown Castle argues "the extensive and unrefuted documentation [it] submitted demonstrated[:]" (i) "that there were no feasible less intrusive locations in the ROW for the installation of the SWFs[;]" (ii) the SWFs conform with the Town Code requirements[;] and (iii) "the SWFs would not result in significant aesthetic or visual impacts or alter the primarily residential land use setting[,]" findings of which were disregarded by the ZBA. (*Id.* at 18.)

With respect to its second claim, Crown Castle argues the Town's denial of its Applications "materially inhibited Crown Castle's ability to not only fill a coverage gap but also to densify its wireless network" because: (i) Mr. Conroy's reports and supplemental materials "established the need to densify Verizon Wireless's network based upon key performance indicator data, including downlink physical resource block utilization for each of Verizon's frequencies . . . [and] by denying the Applications . . . the Town materially inhibited Crown Castle's ability to deploy the performance characteristics and technology of its choosing in its

25

efforts to densify its wireless network[;]" and (ii) the Town's denial "based upon its seeming technology preference for the installation of macro towers, despite the overwhelming evidence submitted by Crown Castle demonstrating the inability of any existing or new macro site to provide coverage or capacity to the dense residential gap areas, materially inhibited Crown Castle's ability to fill the gaps and densify its networks" by "unlawfully specifying 'the means or facilities' through which Crown Castle must offer its services." (*Id*. at 25-26) (citing *Small Cell Order*, 33 F.C.C.R. at ¶ 37).

With respect to its third claim, Crown Castle argues the Town "has materially limited, and thus effectively prohibited the provision of personal wireless services" because "Ch. 242 contains provisions that give the Town the right to reject any application based upon vague and subjective factors that are deemed pertinent by the Town." (*Id*. at 28.) For example, in applying Ch. 242's visual impact requirements, Crown Castle argues "the Town does not apply any objective criteria or set subjective criteria to determine whether a facility is a significant visual intrusion," but rather "makes a site-by-site determination and discusses with the applicant whether there are less obtrusive solutions." (*Id*. at 29.) Crown Castle argues that the Town "took advantage of these factors as well as other procedures, requirements, and gimmicks to make the application and hearing processes more onerous and to unreasonably delay and ultimately bar Crown Castle's access to the ROW, which is precisely the course of action that Congress intended to stop with the enactment of the TCA." (*Id*. at 28.)

With respect to its fourth claim regarding the unreasonableness of application fees, Crown Castle argues that the Town "imposed upon Crown Castle application and escrows fees in excess of thirteen times the amount of the FCC's presumptively reasonable fees . . . and the Town has failed to put forth any evidence in discovery to rebut the presumptive fee limits." (*Id*.

at 37.) Plaintiff argues that based on the suggestion of the FCC in its 2018 Small Cell Order, it should have paid no more "$500 for non-recurring fees, including a single up-front application that includes up to five SWFs, with an additional $100 for each SWF beyond five." (*Id*. at 32-33.)

Specifically, Crown Castle argues that "Ch. 242 shows a clear imbalance of the fees imposed for DAS node permits compared with the fees imposed for other permits . . . [w]ireless applicants must pay $650 to obtain a building permit to install a DAS node on an existing utility pole and $900 for a DAS node on a new pole, while an application for a commercial wi-fi node must pay only $200 regardless of existing or new infrastructure . . . [w]ireless applicants are also required to pay $2,000 to obtains a highway permit, regardless of the scope of the work, while most other applicants are generally only required to pay $100." (*Id*. at 34.) Additionally, Crown Castle argues the costs incurred by the Town in evaluating its Applications were not "'objectively reasonable'" (*Id*. at 35) (citing *Small Cell Order*, 33 F.C.C.R. at ¶ 50), specifically with respect to Comi's consultant fees. (*Id*. at 35-36.)[14]

Finally, with respect to its fifth claim, Crown Castle argues that "[i]t is well-established that the appropriate remedy for violations of the TCA, such as those [allegedly] committed by the Town, is a mandatory injunction allowing immediate construction and operation" of the proposed facilitates (*Id*. at 37), and to this end, Crown Castle claims it is entitled to a mandatory

---

[14] CMS charged the Town $250 per hour for everything from Comi's substantive review of the Applications to routine data entry by an administrative assistant, who charges CMS $44 per hour for her clerical work. (*Id*. at 36; ECF No. 31-1 at ¶ 46-47.) CMS invoices in connection with the 2020 Permit Applications "reveal that CMS incurred $19,214.52 in consulting fees." (ECF No. 30 at 23; ECF No. 31-1 at ¶ 55). Indeed, it is undisputed CMS charged the Town $19,214.52 in connection with its review of the Applications. (*Id*.) Defendants contend that Section 13(f) of Ch. 242 implements a fee cap "as to the total consultant fees to be charged to the applicant, which shall be the greater of $17,000[,]" but do not cite to an Exhibit or Section of Ch. 242 to support this statement. (ECF No. 30 at 23.)

injunction "directing the Town to immediately issue all approvals and permits necessary for the installation of its SWFs in the ROW without the imposition of any further fees." (*Id*. at 38.) Crown Castle additionally requests the "disgorgement and return of $189,950.00 in excess fees, plus interest from September 24, 2020" that it paid to the Town. (*Id*.)

In Opposition, Defendants argue: (i) the ZBA's denial of Crown Castle's Applications was "in writing and supported by substantial evidence[;]" (ii) the ZBA's denial was not an "effective prohibition of services" under the TCA; (iii) the application and consultant fees are neither excessive or effectively prohibit service." (ECF No. 30 at 2.) With respect to its first argument, Defendants claim the ZBA's denial "rationally explains and concludes that Plaintiff failed to establish a legitimate need and/or gap in coverage *i.e.*, the ability of a wireless telephone to have access to land-lines and not densification of 4G coverage." (*Id*. at 9.) Specifically, Defendants argue that Crown Castle "seeks not to 'fill the gap' by permitting wireless user to access land-lines, but rather to improve and 'densify' Verizon's network[,]" a goal not protected by the TCA. (*Id*. at 10-11.)

Second, Defendants argue that the ZBA's denial was not a "effective prohibition of services" under the TCA because Crown Castle: (i) "failed to show there is a 'significant gap' in coverage as wireless telephone users in the relevant geographic area presently have the ability to access to landlines[;]" and (ii) "failed to present any evidence that it thoroughly investigated and explored, in good faith, other alternative and/or less intrusive sites." (*Id*. at 14-15.) Specifically, Defendants note that the ZBA observed that "[n]o evidence was presented as to efforts to locate macro sites . . . or contemplate the possibility of co-locating on sites utilized by other providers." (*Id*. at 15-16.) Moreover, Defendants argue neither Ch. 242 nor the Town's application and review process materially inhibited the provision of wireless services. (*Id*. at 17.) Defendants

maintain that the challenged sections of Ch. 242 are not invalid solely on the grounds that they afford the Town discretionary authority to deny an application, and that the length of the Town's review of Crown Castle's applications "was attributable to deficiencies in [Crown Castle's] submissions and the Town's request for supplemental materials." (*Id*. at 17-19.)

Finally, with respect to application and consultant fees, Defendants argue they are neither "excessive nor effectively prohibit service" under the TCA. (*Id*. at 20.) Defendants reiterate that Ch. 242 "requires a $100.00 building permit application fee and an additional telecommunications installation fee between $450.00 and $900.00 (depending if installed indoors/outdoors and on a new/existing structure) . . . [and] Sections 242-5(D) and 242-13 to the Town Code permit the Town to retain a consultant to assist in the review and/or evaluation of an application, to advise the Town on any technical issues, and requires an applicant to provide an escrow deposit of $8,500.00, to be utilized to reimburse the Town for all costs of the Town's consultant in providing evaluation and consultation . . . in connection with the review of any application." (*Id*. at 20.)

Defendants maintain that the application fee required by the Town is "reasonable in light of the size and extent of a telecommunications application and the limited time frame (*i.e.*, the "shot clock"), in which the Town has to review and authenticate the supporting documents and technical information submitted by [Crown Castle] and similar applicants[,]" making the review of a wireless application "more time-sensitive and labor intensive" than a review of a non-wireless application. (*Id*. at 21.) Defendants further argue that the FCC orders Crown Castle relies upon "are not binding interpretations of statutory law, but rather only entitled to deference by the reviewing court . . . [and] the fees suggested by the 2018 Small Cell Order are merely 'presumptively lawful' and fail to consider geographical differences such as the varying range of

29

government costs and salaries depending on the relevant state and/or region." (*Id*. at 22) (quoting *City of Portland v. U.S.*, 969 F.3d 1020, 1042 (9th Cir. 2020)).

With respect to the Town's escrow deposit and consulting costs, Defendants argue Ch. 242 "sets hard cap on the amount of consultant fees" and explicitly provides: "there shall be a fee cap as to the total consultant fees to be charged to the applicant in a chase, which shall be the greater of $17,000[.]" (*Id*. at 23.) Moreover, Defendants argue § 242-13(C) provides "for the refund of all unused escrow payments and permits an applicant can request copies of the invoices paid to a consultant and ask that the Town audit a consultant's invoices for reasonableness and may request relief therefrom." (*Id*. at 22-23.) Defendants further maintain a review of CMS's invoices with respect to the applications shows that the amount of time expended to review them was reasonable, as the invoices reveal that CMS incurred $19,214.52 in consulting fees or 79.1 hours of time, which CMS used to review the applications and communicate with the Town. (*Id*. at 23.)

In its Reply, Crown Castle further argues the Town's denial was not supported by substantial evidence because Crown Castle submitted all forms of documentation and data required by Ch. 242, including "signal propagation and drive test data and maps, key performance indicator data including drop call rates and utilization capacity charts establishing that Verizon Wireless has both capacity needs and significant gaps in coverage in its 3G and 4G LTE frequencies over a nearly five-square-mile portion of the Town in which approximately 10,000 individuals reside." (ECF No. 31 at 9.) Specifically, Crown Castle argues "the drive test and coverage maps [it submitted] demonstrate that all 23 SWFs are located in areas in which the RSRP level (*i.e.*, signal strength) for each of Verizon's licensed 4G frequencies is less than -85

dBm2[15] and in which Verizon has no 3G coverage." (*Id.*) Crown Castle maintains that the "drop call data further demonstrates the existence of the significant gaps in coverage in and around the locations of the SWFs[,]" – specifically "the voice drop call rates exceeded Verizon's and the industry standard '1% drop call metric' throughout each of the polygons between 11% and 61% of the time period analyzed with maximum drop call rates ranging from 8% to 50%, from 7% to 24%, and from 4% to 16% in the various [Woodbury], Syosset, and South Massapequa Polygon sectors, respectively." (*Id.* at 9-10; ECF No. 31-1 at ¶ 137-138.)

In further support of its prohibition claim, Plaintiff argues Defendants failed to rebut the presumption that their delays were unreasonable and materially inhibited the provision of services. (*Id.* at 17-18.) Crown Castle claims Defendants "try to frame the delays in their processing of the Applications as attributable to deficiencies in Crown's submissions and the Town's request for supplemental materials; however, Defendants conveniently fail to address the unreasonable delays" caused by their own failure to timely respond to Crown Castle's legal demands, requests for information and questions. (*Id.* at 18-19.) With respect to fees, Crown Castle asserts that Defendants fail to put forth any evidence to show that the $14,950.00 it charged Crown for building permit application fees and ZBA fees, and the $46,000.00 and $19,950.00 Crown would have been required to pay for highway permits and building permits, respectively, is a "reasonable approximation of the Town's costs." (*Id.* at 20.)

Notably, Plaintiff argues it put forth "uncontroverted evidence in the application review process that significant gaps in service exists over various frequencies using different technologies in the Town, including 3G and 4G LTE, through which Verizon provides personal

---

[15] Crown Castle states that "[a]reas with a signal level less than -85 dBm are considered a service gap because-85 dBm is the minimum level that can provide reliable in-building voice and data services. (ECF No. 31 at 9, Fn. 2.)

wireless services and that the SWFs would fill these gaps." (*Id*. at 22.) Crown Castle asserts Defendants rely on a body of case law that allegedly provides that "a gap in 4G coverage does not establish that the target area is underserved by voice cellular telephone service" – which, according to Plaintiff, "is an overstatement of the showing that this [prohibition] standard requires." (*Id*.) Crown Castle argues each of the cases relied upon by Defendants are inapposite and readily distinguishable "because the carriers in those cases failed to show a gap in coverage in both 3G and 4G and/or failed to put forth any evidence that the [proposed] facilities would provide voice services." (*Id*.)

Crown Castle further maintains that it "submitted drive test maps and coverage maps demonstrating that Verizon has a significant gap in each of their 4G LTE licensed frequencies and absolutely no 3G coverage over a nearly five-square-mile portion of the Town in which approximately 10,000 individuals reside[,]" as further evidenced by "[t]he voice drop call rates, which not only exceeded the 1% industry standard threshold but in fact far exceeded it throughout the data-collection period with maximum drop call rates ranging from 4% to 50% in the various sectors." (*Id*. at 23.) As a result of these findings, Plaintiff argues it demonstrated the SWFs were necessary to provide "access to land-lines" *i.e*., to enable users to make voice calls, and that the SWFs were the "least intrusive means" to remedy the gaps in service. (*Id*. at 23-24.)

## DISCUSSION

### A. Standard on a Motion for Summary Judgment

In order to obtain summary judgment, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Once the movant meets its initial burden, the burden shifts and the nonmovant may defeat the motion only by adducing evidence of specific facts that raise a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002).

"The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts." *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted).  The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely undertake an analysis to *identify* whether triable issue of fact exist. *See Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021). That is, the court's function is "issue-finding," not "issue-resolution."  *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)).  *Au* fond, the court's role is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing *Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

Viewing the facts presented here in the light most favorable to Defendants, the undersigned finds: (i) the ZBA's denial of Plaintiff's Applications was not supported by

substantial evidence on record, (ii) the ZBA's denial was an effective probation of wireless services under the TCA, and (iii) the application criteria and fees imposed by Ch. 242 had the effect of prohibiting the provision of services under the TCA, and, therefore, respectfully recommends Plaintiff's motion for summary judgment be granted as to Plaintiff's claims for violations of Sections 332(c)(7)(B)(iii), 332(c)(7)(B)(i)(II), and 253(a), respectively.

**B.  Violation of Section 332(c)(7)(B)(iii) – "Substantial Evidence"**

Section 332(c)(7)(A) of the TCA, "Preservation of local zoning authority," affords municipalities discretionary authority regarding the "placement, construction, and modification of personal wireless service facilities" in their towns, specifically providing: "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." *See* 47 U.S.C.A. § 332(c)(7)(A); *ExteNet Sys., Inc. v. Vill. of Plandome*, No. CV197054(GRB)(RLM), 2021 WL 4449453, at *14 (E.D.N.Y. Sept. 29, 2021) (the section "preserves state and local zoning authority over the siting of wireless facilities.") However, "[a]ny decision by a State or local government to deny a request to place, construct, or modify personal wireless service facilities" must be: (i) "in writing" and (ii) "supported by *substantial evidence* contained in a written record." *See* 47 U.S.C.A. §332(c)(7)(B)(iii) (emphasis added).

In *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir. 1999), the Second Circuit articulated that in order to determine whether a municipality's decision to deny an application for the placement of wireless service facilities was supported by substantial evidence, this Court must use "the traditional standard used for judicial review of agency actions" – which is "deferential," and "may neither engage in our own fact-finding nor supplant the Town Board's reasonable determinations." *Id*. at 494 (citations omitted) ("Substantial evidence, in the usual

context, has been construed to mean less than a preponderance, but more than a scintilla of evidence.")

Specifically, "the record should be *viewed in its entirety*, including evidence opposed to the Town's view," and "local and state zoning laws govern the weight to be given the evidence." *Id*. (emphasis added). Accordingly, this Court must overturn the ZBA's decision to deny Crown Castle's Applications "if it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [ZBA's] view." *New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola*, No. 01-CV-8211(JS)(WDW), 2003 WL 25787525, at *5 (E.D.N.Y. Mar. 26, 2003). To be sure, "[i]f the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed." *Id*.

The ZBA's ultimate denial of Crown Castle's Applications was based upon three findings: (i) that Crown Castle failed to show a gap in coverage and therefore a need for its 23 proposed nodes; (ii) Crown Castle failed to minimize aesthetic impacts of the nodes in and around the Town; and (iii) Crown Castle failed to consider alternative locations and/or technology. (ECF No. 31-1 at ¶ 136; ECF No. 29-107 at 19-20**.)**. The Court addresses each of the ZBA's conclusions in turn – and for the reasons explained further below – finds they are not supported by substantial evidence on record.

### 1.  Crown Castle Established a Basis for Installing DAS Nodes

As noted above, the ZBA asserts in its denial that Crown Castle: (i) "failed to show and prove the need for the wireless telecommunications facility to provide service primarily and essentially within the Town[;]" (ii) "failed to prove a gap in coverage[;]" and (iii) did not provide raw data and only supplied their interpretation of the data to reach the self-created standard of

1% dropped calls . . . provid[ing] no evidence as to an industry standard . . . [and] no explanation as to why this drop call rate was only existing in these areas of the township." (ECF No. 29-107 at 19-20.) The Court finds the ZBA's determinations with respect a coverage gaps and an overall need for the DAS Nodes within the Town were not supported by substantial evidence.

A wireless carrier's application to install wireless facilities within a township must be evaluated under the standard articulated by the New York Court of Appeals in *Consolidated Edison Co. v. Hoffman*, 43 N.Y.2d 598, 611 (1978). *See New York SMSA Ltd. P'ship v. Town of Oyster Bay*, No. 11-CV-3077 (MKB), 2013 WL 4495183, at *12 (E.D.N.Y. Aug. 16, 2013) ("Wireless carriers are public utilities under New York law[,]" and, as a result, "their application must be evaluated under the standard articulated by the [New York] Court of Appeals."). Under the *Consolidated Edison* "public necessity" standard, a utility must show: (i) the proposed wireless facilities are "a public necessity in that it is required to render safe and adequate service" and (ii) "there are compelling reasons, economic or otherwise, which make it more feasible to build a new facility than to use alternative sources of power such as may be provided by other facilities." *Id*. (citations omitted).

In the context of a telecommunications company such as Crown Castle, this has been interpreted to mean that it must "demonstrate that there was a gap in cell service," and that proposed wireless facility "was more feasible than other options." *Id*. (citations omitted). In other words, under *Consolidated Edison,* Crown Castle must show: (i) "a coverage gap," (ii) that the proposed facility "would remedy the coverage gap," and (iii) that the proposed facility "would have a negligible impact on the community." *Id*.

Here, Crown Castle submitted "extensive and unrefuted documentation" – including "signal propagation and drive test data and maps, key performance indicator data including drop

call rates and utilization capacity charts" to support its contention that the proposed SWFs were "necessary to increase coverage and capacity in order to provide reliable service over nearly five-square mile portion of the Town in which approximately 10,000 reside." (ECF 29-2 at 13.)

Specifically, Crown Castle conducted site visits (ECF No. 31-1 at ¶ 68), submitted several amended applications and supplemental letters (*Id*. at ¶¶ 63, 66, 72, 74, 85, 89, 95-96), submitted three expert reports (*Id*. at ¶ 97-98), appeared for and presented evidence at two public hearings (*Id*. at ¶ 134; ECF No. 29-107; ECF No 31-3), and submitted 1,400 pages of supplemental materials (ECF No. 31-1 at ¶ 122-123; ECF No. 29-96) in support of its Applications and contention that there was a coverage gap in the areas of the proposed nodes, in compliance which Ch. 242, which requires applicants to submit "documentation that demonstrates and proves the need for the wireless telecommunications facility to provide service primarily and essentially within the Town." (ECF No. 31-1 at ¶ 36).

Crown Castle's submissions: (i) showed Verizon has "both coverage and capacity needs and significant gaps in coverage in its 3G and 4G LTE frequencies" and its proposed 23 SWFs would be located in areas in which the signal strength for Verizon's 4G frequencies "is less than -85dBm2 and in which Verizon has no 3G coverage[;]" and (ii) showed the voice drop call rates "exceeded Verizon's and the industry standard '1% drop call metric' throughout each of the polygons between 11% and 61% of time period analyzed[,] with maximum drop call rates ranging from 8% to 50%, from 7% to 24%, and from 4% to 16%" in the various Woodbury, Syosset, and South Massapequa areas." (ECF No. 31 at 9-10.)

*Preliminarily*, the Court notes that neither the Town's expert, Comi, nor the Town gathered or submitted any data to disprove Crown Castle's expert's "data and conclusions" which established "the significant gaps in service and capacity needs that would be remedied by

the SWFs" (ECF No. 29-2 at 13), and it is undisputed that Comi did not attend the site walks or otherwise visit any of the locations of the proposed SWFs. *See* ECF No. 31-1 at ¶ 69; ECF No. 31-1 at ¶ 115 ("Comi posed several questions regarding the data and findings contained in the 2021 Conroy Report, including Verizon Wireless's design criteria metrics; however, Comi did not put forth, or even collect any data of his own to dispute Conroy's findings"). *See ExteNet Sys., Inc.*, No. CV197054GRBRLM, 2021 WL 4449453, at *14 (citations omitted) ("[Other than the evidence provided by plaintiff which supports plaintiff's representation that there is a gap [in coverage,] the Board here effectively had no evidence before it to conclude otherwise. . .. [t]hus, plaintiff has demonstrated that it did have a service gap, and therefore, the need for a facility to remedy the gap."); *New York SMSA Ltd. P'ship*, No. 11-CV-3077 (MKB), 2013 WL 4495183, at *13 ("[O]ther than the expert testimony of [plaintiff's] which supports plaintiff's representation that there is a [coverage] gap, the Board had no evidence before it to conclude otherwise" and therefore "plaintiff has demonstrated that it did have a services gap").

In its denial, the ZBA sought to refute Crown Castle's expert findings on the grounds that (i) members of the ZBA and residents of the Town questioned the accuracy of the coverage deficiency data by noting that they did not experience any problems with their Verizon cellular service; (ii) there was an alleged absence of data documenting the frequency of dropped calls, which, in the ZBA's view, served as affirmative evidence that no coverage gap existed; and (iii) Mr. Comi ultimately concluded in the June 2021 Review Letter that there was already reliable service in the areas of the proposed nodes. (ECF No. 31-1 at ¶ 134.) However, the Court finds these pieces of "evidence" "do not constitute reliable, much less substantial evidence on which the [ZBA] could base its finding of adequate reliable service" in the area of the proposed nodes. *Extenet Sys., LLC v. Vill. of Kings Point*, No. 21-CV-5772 (KAM)(ST), 2022 WL 1749200, at

*16 (E.D.N.Y. May 31, 2022), *aff'd sub nom. Extenet Sys., LLC. v. Vill. of Kings Point*, No. 22-1265, 2023 WL 4044076 (2d Cir. June 16, 2023).

   *First*, the ZBA and residents of the Town did provide any evidence of their own to support their contentions at the March 25, 2021 hearing that there was reliable services in the areas of the proposed nodes.[16] Their testimony alone that they themselves did not experience dropped calls or receive complaints regarding dropped calls in those areas is not sufficient to support a finding of reliable service as a matter of law. *See New York SMSA Ltd. P'ship*, No. 11-CV-3077 (MKB), 2013 WL 4495183, at *13 ("The Board's conclusion which was based on its own analysis is unsupported by substantial evidence in the record and cannot be the basis of a denial of a special use permit"); *New York SMSA Ltd. P'ship* v. *Vill. of Floral Park Bd. of Trustees*, 812 F. Supp. 2d 143, 162 (E.D.N.Y. 2011) (holding a Board may not deny an application for the placement of wireless services based on the "unverified, untested, anecdotal statements by Board members and residents about their personal coverage experience over the detailed and extensive expert testimony and evidence regarding the existence of a service deficiency" in the proposed area); *T-Mobile Ne. LLC v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 272 (E.D.N.Y. 2011) (finding the town board failed to provide any evidence to contradict T-Mobile's reports and witnesses which showed a "clearly defined, tested, significant gap in

---

[16] As previously noted, and reported by the ZBA, one attorney's opposition to Crown Castle's Applications at the March 15, 2021 hearing included coverage maps that Verizon provides on its own website so that consumers can judge the reliability of their service. (ECF No. 29-107 at 9-10.) The attorney specifically provided a map for Calvert Avenue, which "showed complete coverage." (*Id.*) The ZBA stated that the attorney's presentation "clearly shows that Verizon is either being disingenuous with the Board by claiming that their coverage is incomplete or is being disingenuous with the consumer public with a map showing coverage." (*Id.*) This Court has previously noted, however, that coverage maps displayed on Verizon's website "are not a guarantee of coverage and contain areas of no service and are a general prediction of where rates apply based on [Verizon's] internal data." *ExteNet Sys., Inc.*, No. CV197054GRBRLM, 2021 WL 4449453, at *16 (holding Verizon's website maps were not enough to call into question the overwhelming amount of evidence presented by plaintiff demonstrating a gap in coverage).

service[,]" and, therefore, the Board's determination was not supported by substantial evidence on record).

This is not to say that the ZBA was "bound to accept" Crown Castle's expert testimony, but rather it "insufficiently contested" Crown Castle's "properly credentialed expert testimony" at the hearings, arriving at its opinions on the basis of personal experience and the experience of the Town's residents alone. *New York SMSA Ltd. P'ship,* 812 F. Supp. 2d at 160–61 ("[T]the Board's disbelief of the accuracy and adequacy of the expert's testimony and supporting data was largely based on their own personal experience of not having a problem with dropped calls."); *MetroPCS New York, LLC v. Vill. of E. Hills*, 764 F. Supp. 2d 441, 454–55 (E.D.N.Y. 2011) (individual customer opinions about the adequacy of their service, which are "not based upon any objective evaluations or studies described in the record" are insufficient to challenge Verizon's objective evidence showing a coverage gap.)

*Second*, the ZBA ignored the substantial amount of data documenting the frequency of dropped calls in the areas of the proposed nodes. As previously mentioned, Crown Castle provided drop call rates which "not only exceeded the 1% industry standard threshold but in fact far exceeded it throughout the data collection period, with maximum drop call rates ranging from 4% to 50% in the various sectors." (ECF No. 31 at 23.) The ZBA challenged 1% drop call metric, suggesting it was created by – and self-serving to – Verizon (ECF No. 31-1 at ¶ 136; ECF No. 29-107 at 19-20), but did not provide an alternative drop call metric to examine. To be sure, Courts examining whether proposed wireless facilities are necessary to provide residents with access to landlines (*i.e.*, to enable Verizon's customers to make phone calls), have found dropped call rates ranging from 1.96 to 8% demonstrate a significant gap in coverage. *See Cellular Tel. Co. v. Zoning Bd. of Adjustment of Borough of Harrington Park*, 90 F. Supp. 2d

557, 564 (D.N.J. 2000) (finding where a cell site typically loses from 5% to 7% of calls on any given day, there is a significant gap in coverage in the area of the cell site); *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 51 (1st Cir. 2012) (Plaintiff's expert's figure of 2-3% of dropped calls constituted a significant gap in coverage, the Board's finding of .66% dropped calls was not supported by substantial evidence); *Am. Cellular Network Co., LLC v. Upper Dublin Twp.*, 203 F. Supp. 2d 383, 394 (E.D. Pa. 2002) ("Although there surely can be no hard-and-fast percentage of failed calls to define a significant gap, . . . a line of demarcation falling somewhere between 1.96% and five-to-seven percent is a reasonable interpretation of the TCA.")

*Third*, the ZBA improperly relied upon the opinions and conclusions made by Comi in the June 2021 Review Letter to come to the determination that there was no gap in coverage in the area of the proposed nodes – conclusions made based on the actual evidence gathered by Crown Castle's expert, Mr. Conroy. With respect to this point, *MetroPCS New York, LLC v. Vill. of E. Hills*, 764 F. Supp. 2d 441, 454 (E.D.N.Y. 2011) ("*Metro*") is illustrative. In *Metro*, MetroPCS engaged in a nearly identical application process for the provision of wireless facilities in the Village of East Hills as Crown Castle did with the Town Board and the ZBA in the instant case. *Id.* at 447. In that case, the ZBA similarly concluded that MetroPCS had not demonstrated the need for its proposed wireless facilities – in part, based on the conclusions of the Village's retained expert, Mr. Comi that there was reliable service in the areas of MetroPCS's proposed SWFs. *Id.* at 454. This Court noted that Mr. Comi: (i) was not licensed as an engineer or architect and was not a certified planner or appraiser; (ii) did not perform or participate in a "drive test" with respect to MetroPCS's application; and (iii) did not "utilize personally any expert testing equipment to measure [MetroPCS's] signal strength in the area[,]" but merely reviewed the testimony and reports from MetroPCS's expert engineers supporting

MetroPCS's claim that a significant coverage gap existed. *Id*. at 453. Judge Feuerstein concluded:

> Each of the reports and witnesses Metro[PCS] presented to the board testified to the existence of a clearly defined, tested, significant gap in service. The only evidence in the record that contradicts the claim is Mr. Comi's testimony. However, a number of deficiencies found by Mr. Comi are addressed in [MetroPCS's expert] report[s] and testimony. Mr. Comi's claim that the website depicts a coverage map of reliable service in the area is not supported by any evidence in the record. Insofar as Mr. Comi disagrees with Metro's determination of a coverage gap, his opinion is not based upon any objective evaluations or studies that he described in the record. Although the board is not compelled to rely exclusively on expert testimony, a finding which relies on Mr. Comi's unsupported opinion to the exclusion of all other witnesses is not based upon substantial evidence.

*Id*. at 454–55. Here, as in *Metro*, Crown Castle's expert Mr. Conroy, a certified engineer, submitted raw data, expert reports, and supplemental letters, as well as testified before the ZBA in support of Crown Castle's contention that there existed a significant gap in coverage in the area of the proposed nodes, as well as responded to and addressed concerns and questions posed by Mr. Comi in the June 2021 Review Letter. (ECF No. 31-1 at ¶ 122-123; ECF No. 29-96.) As Mr. Comi has not supported his opinions with "objective evaluations or studies[,]" the undersigned finds that it was improper for the ZBA to base their finding of reliable service on Comi's opinions alone. *MetroPCS New York, LLC*, 764 F. Supp. 2d at 454.

Accordingly, the ZBA's determination that Plaintiff failed to establish a coverage gap and associated need for the proposed nodes is not supported by substantial evidence on record. The other two grounds for the ZBA's denial (*i.e.*, aesthetic impact and alternative options) both fall under the "negligible impact" element of the *Consolidated Edison* test.

## 2. Crown Castle's Application Minimized Aesthetic Impact

As noted above, the ZBA further asserted that Crown Castle "failed to show and document that the proposed work will maximize the use of building materials, colors and textures designed to blend with the structure to which it may be affixed and/or to harmonize with

the natural surroundings and the utilization of stealth or concealment technology required by the Town." (ECF No. 31-1 at ¶ 136; ECF No. 29-107 at 19-20.) These determinations were also not supported by substantial evidence.

The relevant sections of Ch. 242 – at least, those that actually impose specific requirements for applications – require that applicants submit:

> a full statement and substantive explanation to show that pursuant to a study undertaken by the applicant employing due diligence, the proposed placement site is justified, in that alternate placement sites, co-location sites, or other alternate methods, which would have a lesser negative effect on area character, property values and aesthetics than the selected site would be technically unfeasible, commercially impracticable, or otherwise inappropriate; and
>
> a demonstration that the facility will be sited so as to minimize visual intrusion as much as possible, given the facts and circumstances involved, and will thereby have the least adverse visual effect on the environment and its character and on the residences in the area of the new wireless telecommunications facility.

(ECF No. 31-1 at ¶ 36.)

In support of its application, and in compliance with Ch. 242, Crown Castle submitted the Doon Report, which demonstrated that the proposed SWFs "conform with the Town Code requirements, and that the SWFs would not result in significant aesthetic or visual impacts or alter the residential land use setting" in an around the Town. (ECF No. 31-1 at ¶ 106; ECF No. 29-2 at 17-18.) With respect to the design and location of the proposed SWFs, Crown Castle made several efforts to address the Town's concerns, including: (i) eliminating one proposed SWF from its application (ECF No. 31-1 at ¶ 70,74); (ii) relocating three of its SWFs within the ROW (*Id*.); (iii) reducing the height of the poles from 50 feet to 35 feet, "consistent with the typical utility poles in the ROW" (*Id*. at ¶ 23); and (iv) adjusting the design and location of several SWFs to "further reduce potential effects on neighboring residential uses." (*Id*. at ¶ 70.) *See e.g.*, *ExteNet Sys., Inc*., No. CV197054(GRB)(RLM), 2021 WL 4449453, at *18 (citing *Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*, 552 F. App'x 47, 50-51 (2d Cir.

43

2014) ("[T]he Second Circuit has held that installations of antennas that "added less than eight feet to existing thirty-foot utility poles" amount[] to merely a "de *minimus*" aesthetic intrusion.")

The ZBA claimed it was reported that the proposed SWFs would be "placed directly in front of residents' homes and windows" and would not fit it with the "residential character of the area," further stating that Crown Castle presented "no alternate materials, colors or technology" and noting that it received further public comment at the March 25, 2021 hearing to this effect. (ECF No. 29-107 at 4-5.) Indeed, much of Defendants' argument as to aesthetic impact relies on "impassioned commentary" from ZBA Board members and residents of the Town, about the "residential character of the area." *ExteNet Sys., Inc.*, No. CV197054(GRB)(RLM), 2021 WL 4449453, at *18 ("Where defendants do cite to the record, they generally point to comments from residents, the lion's share of which are, as noted above, generic statements that failed to identify any issues that could be meaningfully addressed (other than by declining to install any nodes at all)."); *see also Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 495 (2d Cir. 1999) (finding the municipality's reliance on resident testimony regarding aesthetic concerns was misguided where residents "did not articulate specifically how the proposed cell sites would have an adverse aesthetic impact on the community" and "did not understand what the proposed cell sites would actually look like.").

While "residents' aesthetic objections – even when many comments 'amount to no more than generalized hostility,'" like much of the residents' comments here – "may serve as a basis for denial of a permit under the TCA[,]" the comments must be "supported by any empirical data or expert testimony" and sufficiently "counter the evidence presented" by Crown Castle. *See Gonzalez v. Zoning Bd. of Appeals of Town of Putnam Valley*, 3 A.D.3d 496, 497–98 (N.Y. App. Div. 2d Dep't 2004) (holding that "[t]he generalized and unsubstantiated concerns of neighboring

owners, upon which the Zoning Board based its determination, that the character of the neighborhood would be detrimentally changed if the petitioner's application for variances was granted, were unsupported by any empirical data or expert testimony and were insufficient to counter the evidence presented by the petitioner"); *T-Mobile Ne. LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 461–62 (S.D.N.Y. 2009) ("The record provides little support for the Planning Board's conclusion that T–Mobile's tower would be an 'eyesore.'").

The undersigned finds the Town was not presented with any meaningful comments regarding the aesthetic impact of the proposed nodes described in Crown Castle's Applications and did not otherwise present its own data to counter Crown Castle's expert's findings that the proposed nodes would have minimal aesthetic impact on the Town. *See T-Mobile Ne. LLC v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 268 (E.D.N.Y. 2011) ("The record provides little support for the ZBA's conclusion that the construction of T–Mobile's Proposed Facility would have a negative impact on existing aesthetic conditions at the Premises . . . [t]he conclusions of Mr. Comi are not supported by any credible evidence.") Further, Crown Castle's Applications fully complied with the aesthetic requirements of Ch. 242 – as the Town's Special Counsel and Comi previously conceded – "Section 242-5(N) require[s] only that [the SWFs] 'harmonize' with the surrounding area . . [and, as] evidenced by the lack of community complaints received during this time, [Crown Castle's] existing facilities have blended into the surrounding communities and therefore, do not appear to be any more visually intrusive, and potentially less so, than alternative stealth designs." (ECF No. 31-1 at ¶ 88; ECF No. 29-8.) To this end, the Court finds the ZBA's decision that the installation of the proposed SWFs would have a negative aesthetic impact on the area of the proposed nodes is not supported by substantial evidence.

**3.   Crown Castle Adequately Considered Alternative Options and Locations for DAS Nodes**

As noted above, the ZBA based its denial in part on the grounds that Crown Castle "provided no evidence as to the availability of macro sites or their efforts to obtain new sites or enhance existing macro sites" as an alternative option to Crown Castle's proposed DAS Nodes. These determinations were also not supported by substantial evidence. (ECF No 31-1 at ¶ 136; ECF No. 29-107 at 19-20.)

Throughout the Application process, Crown Castle contended – and provided evidence to support its contentions – that there were no feasible alternatives to SWFs and there were no feasible, less intrusive locations in the ROW for the installation of the SWFs. (ECF No. 31-1 at ¶ ¶ 7, 103; ECF No 29-107 at 8-9; ECF No. 29-96 at 1.) Specifically, the 2021 Conroy Report and Mr. Conroy's supplemental submissions, the Pole Justification Report, the Doon Report, and expert testimony presented to the ZBA at the March 25, 2021 hearing all demonstrated that there were no feasible alternatives to SWFs for the implementation of wireless services in the ROW. (*Id.*) *See ExteNet Sys., Inc*, No. CV197054(GRB)(RLM), 2021 WL 4449453, at *22 ("The record clearly reflects that plaintiff engaged in a colloquy with both residents and the Board over a number of months, testing the feasibility of proposed sites and reporting back to the Board with results – often adopting the Board's proposals.")

With respect to macro sites, Mr. Conroy's findings provided evidence as to the availability of macro sites and alternative technologies, and described Crown Castle's efforts to explore the options of obtaining new sites or enhancing existing macro sites before applying for a permit to implement SWFs. (*Id.*) Mr. Conroy: (i) "evaluated existing macro sites and other structures within each polygon and determined that it is "not feasible to construct a new tower due the dense residential nature of the area" (ECF No. 31-1 at ¶ 103); (ii) determined that

existing macro sites are located too far from the areas of the SWFs to provide reliable service, and thus, are not feasible alternatives (*Id*.); and (iii) submitted raw test drive data for both macro coverage and DAS coverage, which confirm that no macro sites were sufficient to remedy the coverage gaps." (*Id*. at ¶ ¶ 103, 127-131.) Crown Castle contends that the 1,400 pages of supplemental materials submitted to the ZBA additionally "established not only the need for the SWFs but also that there were no feasible alternatives to remedy the significant gaps in service or Crown Castle's capacity needs." (ECF No. 29-2 at 19.)

The undersigned finds Crown Castle met its burden in showing that other alternatives and locations that it did investigate were not feasible. *See, e.g.*, *New York SMSA Ltd. P'ship v. Town of Oyster Bay*, No. 11-CV-3077(MKB), 2013 WL 4495183, at *18 (E.D.N.Y. Aug. 16, 2013) (citations omitted) ("A plaintiff need not evaluate every potential alternative in order to demonstrate that its proposal meets the least restrictive means test . . . [t]he law only requires a plaintiff to engage in a good faith effort to evaluate alternative sites."); *New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals*, No. 08-CV-4833 (JS)(AKT), 2010 WL 3937277, at *6 (E.D.N.Y. Sept. 30, 2010) (holding that where Verizon gave "similar, good-faith justifications for why all other sites, including ones suggested by the Board and others it sought out on its own, would not substitute" for its proposed wireless facilities, it "met its burden of investigating alternatives and presented credible evidence regarding the infeasibility of the sites.").

By contrast, the ZBA neither presented evidence contrary to Crown's findings nor in support of its assertions that macro sites were in fact "feasible or appropriate alternatives" to Crown Castle's proposed nodes. In fact, the record shows that the ZBA failed to review – or blatantly ignored – the evidence presented by Crown Castle with respect Crown Castle's contentions that the macro sites were not a feasible option for providing wireless service in and

around the Town.[17]  *See, e.g.*, *ExteNet Sys., Inc*., No. CV197054(GRB)(RLM), 2021 WL 4449453, at *21; *New York SMSA Ltd. P'ship v. Town of Oyster Bay*, No. 11-CV-3077(MKB), 2013 WL 4495183, at *18 (E.D.N.Y. Aug. 16, 2013) ("The Board is required to support its decision with substantial evidence that the alternative sites were feasible."); *Town of Oyster Bay Zoning Bd. of Appeals,* 2010 WL 3937277, at *6 (emphasis in original) (where the "[t]he Board presented *no evidence* that other sites were appropriate substitutes for the Property" and that the plaintiff had clearly explained that the alternative site preferred by the board was not feasible, the Board's decision was not supported by substantial evidence); *New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola*, No. 01-CV-8211(JS)(WDW), 2003 WL 25787525, at *9 (E.D.N.Y. Mar. 26, 2003) ("The Board offers no evidence to support their findings of fact, they instead chose to attack Verizon's methods as insufficient to show good faith.").

Even if the macro sites were feasible, the ZBA's argument that three 120 to 180-foot macro cells would somehow be "less impactful" than 23 small cells is "on its face questionable,"[18] and the fact that the ZBA presented "no evidence from the record to support this argument makes it absurd." *ExteNet Sys., Inc.*, No. CV197054(GRB)(RLM), 2021 WL 4449453, at *20. After reviewing the record, the undersigned concludes Crown Castle met its burden of investigating alternatives and presented credible evidence regarding the infeasibility macro sites, and therefore, finds the ZBA's conclusion to the contrary was not based on substantial evidence. Accordingly, Plaintiff has met its burden by demonstrating a gap in service, that the proposed SWFs would remedy the gap, and that the SWFs would have minimal impact on the community,

---

[17]  The September 9, 2021 ZBA hearing Transcript contains no mention of any supplemental materials submitted by Crown Castle (ECF No. 31-1 at ¶ 131), and members of the ZBA admittedly "couldn't go through every page [of the hundreds and hundreds of pages], particularly the technical part" that was "well beyond [their] scope of intelligence" (*Id*. at ¶ 28.)

[18]  As Crown Castle has reported, macro sites in 120' to 180' in height, serving a large geographic area and many customers from a single location. (*Id*. at ¶ 7.)

and thus the undersigned respectfully recommends Plaintiff's motion for summary judgment on

its Section 332(c)(7)(B)(iii) claim against Defendants be granted.

**C.** **Violation of Section 332(c)(7)(B)(i)(II) – "Prohibition of Personal Wireless Services"**

Under the TCA, a municipality's discretionary authority over personal wireless service is

limited in that "the regulation of the placement, construction, and modification of personal

wireless service" cannot "prohibit or have the effect of prohibiting the provision of wireless

services." 47 U.S.C. § 332(c)(7)(B)(i)(II); *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d

Cir. 1999) ("*Willoth*") (holding that under the TCA's "effective prohibition" provision, local

governments may not regulate personal wireless service facilities in such a way as to prohibit

remote users from reaching such facilities . . .[i]n other words, local governments must allow

service providers to fill gaps in the ability of wireless telephones to have access to land-lines.").

Under the Second Circuit's *Willoth* standard, a plaintiff will prevail on "effective

prohibition" claim pursuant to Section 332(c)(7)(B)(i)(II) if: (i) "it shows that a 'significant gap'

exists in wireless coverage" and (ii) "that its proposed facility is 'the least intrusive means' to

close that gap." *T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 456-57

(S.D.N.Y. 2009) (citing *Willoth*, 176 F.3d at 643). As explained above, Defendants here also

violated the "effective prohibition" provision of the TCA by denying Crown Castle's

Applications,[19] even though Crown Castle sufficiently demonstrated that significant coverage

---

[19] As previously stated, Crown Castle argues that the ZBA's ultimate denial of its applications "materially inhibited" and "effectively prohibited" is provision of wireless services in and around the Town in violation of the TCA. (ECF No. 29-2). In addition to the ZBA's ultimate denial of its Applications, Plaintiff contends that the Town's actions and inaction throughout the application process, the application criteria, the application fees imposed upon it by the Town, all violate 332(c)(7)(B)(i)(II) because they have the effect of prohibiting the provision of Plaintiff's services in the Town. (*Id.*) However, for the reasons explained below, the Court declines to address the remainder of Plaintiff's prohibition arguments under 332(c)(7)(B)(i)(II) because its arguments regarding unreasonable fees and application criteria are facial challenges to the Town Code that are analyzed under Section 253(a) of the TCA (*see infra* D. Violation of Section 253(a) – Facial Challenge of the Town Code), and its claims of delay in processing

gaps existed (*see supra* B.1) and that its proposed SWFS were the least intrusive means for

closing those coverage gaps (*see supra* B.2-3). *See e.g., UP State Tower Co., LLC v. Town of*

*Tonawanda, New York*, No. 118CV00952(LJV)(MJR), 2020 WL 8083693, at *7 (W.D.N.Y.

Nov. 18, 2020), *report and recommendation adopted*, No. 18-CV-952(LJV)(MJR), 2021 WL

50906 (W.D.N.Y. Jan. 6, 2021).

      Defendants seek to undermine Plaintiff's prohibition claims in claiming that Crown

Castle "failed to show there is a 'significant gap' in coverage as wireless telephone users in

relevant geographic area presently have the ability to access *landlines*" (ECF No. 30 at 14-15),

and Plaintiff's true objective is not to permit wireless users in the Town to access land-lines, but

rather to "*improve"* and "*densify"* Verizon's 4G network, a purpose which Defendants claim is

not protected by the TCA. *See id*. at 9-11 (emphasis added) ("The [ZBA's] [d]enial rationally

explains and concludes that Plaintiff failed to establish a legitimate need and/or gap in coverage,

---

its Applications are moot in light of the Town's denial of said Applications. *See Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F.Supp.2d 205, 214, Fn. 7 (S.D.N.Y.2004) (claim for injunctive relief for violation of Section 332(c)(7)(B)(ii) mooted by subsequent denial of application); *see also N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 99 F.Supp.2d 381, 394 (S.D.N.Y.2000) (finding after Town Board reached decision denying applications, claim of delay was moot because plaintiffs could "no longer make the claim that the delay had the effect of denial of wireless services"); *Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*, No. 12-CV-6157 CS, 2013 WL 3357169, at *17 (S.D.N.Y. July 3, 2013), *aff'd*, 552 F. App'x 47 (2d Cir. 2014) (citing *Shot Clock Order*, 24 F.C.C. Rcd. at 14005 n. 99) ("[A] 'local authority's exceeding a reasonable time for action would not, in and of itself, entitle the siting applicant to an injunction granting the application'"). Nevertheless, the undersigned notes with respect to applications delays "CMS and Mr. Comi delayed the [A]pplication[s] by repeatedly requesting unnecessary information and belaboring issues already resolved," resulting in the ZBA issuing a final decision on the Applications on September 9, 2021, nearly *two years* following Crown Castle's initial application submission on July 27, 2020. *See* ECF No. 31-1 at ¶ 63; *MetroPCS New York, LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 424 (S.D.N.Y. 2010) (collecting cases) ("Courts have considered this sort of behavior by towns and local planning boards to constitute unreasonable delay under the TCA."). Thus, the undersigned concludes that the Town unreasonably delayed Crown Castle's applications, and although injunctive relief is unavailable on this ground, "the finding of unreasonable delay is relevant to the reasonableness of the fees incurred throughout the application process." *Id*; *see infra* D.2.

*i.e.*, the ability of a wireless telephone to have access to land-lines and not *densification* of 4G coverage.")

In arguing so, Defendants rely on a body of case law from this Court concluding that a "gap in 4G coverage does not establish that a target area is underserved by voice cellular telephone service" under the TCA. *See id.* at 11-13; *Accord Crown Castle NG East LLC v. Town of* Hempstead, 2018 WL 6605857, at *9 (E.D.N.Y. Dec. 17, 2018). The Court addresses each of the decisions primarily relied on by Defendants: (i*) Clear Wireless v. Bldg. Dept. of Vil. of Lynbrook*, 2012 WL 826749, *7 (E.D.N.Y. Mar. 8, 2012) ("*Lynbrook*"), (ii) *Crown Castle NG E. LLC, v. Town of Hempstead,* 2018 WL 6605857, at *10 (E.D.N.Y. Dec. 17, 2018) ("*Hempstead*"), and (iii) *ExteNet Sys., Inc. v. Vill. of Flower Hill*, 617 F. Supp. 3d 125, 130 (E.D.N.Y. 2022) ("*Flower Hill*") (collectively, "the 4G line of cases") in turn, and finds they are distinguishable from the instant case.

In *Lynbrook*, Clearwire, a provider of 4G wireless broadband service, submitted applications to the Village of Lynbrook to obtain a special use permit to construct and operate a telecommunications facility, which was subsequently denied by the Village board. *Lynbrook*, No. 10-CV-5055 (ADS)(ETB), 2012 WL 826749, at *1. During the hearing on its application, Clearwire implied that a failure to upgrade to 4G could "negatively impact Sprint's personal wireless services, leading to a deficiency in voice services," however, the Court noted that Clearwire: (i) "offered no evidence to support this contention beyond an anecdote about an increase in dropped calls following the release of the iPhone[,]" and (ii) "explicitly stated that the 'need' for its service *was the benefit of 4G* and not the '*need for the service in a particular area where coverage may not be provided*.'" *Id*. at *7 (emphasis added).

Rather, Clearwire's representative stated "the proposed facilities would benefit the residents of Lynbrook, as well as the residents in the areas connected by the facility, by 'enabling them to receive 4G service and to get all the benefits from 4G service . . . streaming movies, streaming video, video conferencing, downloading files.'" *Id*. Judge Spatt ultimately held that Clearwire did not demonstrate a significant gap in coverage existed in the Village under the TCA (*i.e.*, that Village residents lacked access to landlines), and the company's goal of expanding its 4G coverage was not an objective protected by the TCA. *See id*. at *9.

Likewise, in *Hempstead*, Crown Castle submitted applications to construct and install 4G LTE towers in areas designated as rights of way owned by the Town of Hempstead, which were subsequently denied by the Town. *Hempstead*, No. CV 17-3148 (GRB), 2018 WL 6605857, at *1. Judge Brown acknowledged that Crown Castle "submitted significant evidence in an effort to demonstrate an existing 'gap' in 4G coverage that the subject nodes are intended to remedy[,]" but further stated that "[a] gap in 4G coverage does not establish that the target area is underserved by voice cellular telephone service . . . [t]he mandate of the Second Circuit on this question is clear: under §332, Crown Castle is entitled to heightened protections for applications relating to a deficit in 'the ability of wireless telephones to have access to land-lines.'" *Id*. at *8 (citing *Willoth,* 176 F.3d at 643). Judge Brown found the evidence presented by Crown Castle was "replete with data about 4G service, [but was] all but silent on the question of the availability of service generally" (*i.e.*, 3G or traditional voice coverage), and opined:

> [T]he remaining question for the Court is whether the 'gap' in service has been demonstrated. Plaintiff largely misstates the nature of the problem, contending that 'it simply does not make technological sense to fill an identified gap in wireless coverage with an old technology, such as 3G wireless service.' But the issue is not whether to fill a gap with 3G technology, but rather, factoring in existing 3G and 4G availability, does a deficit exist?

*Id.* at *8. Judge Brown ultimately denied Crown Castle's motion for summary judgment, but stated that he was "prepared to schedule a hearing on the issue of whether, in considering the availability of 3G *and* 4G LTE service in the target geography (as well as any other available mechanisms that provide connections between mobile telephones and the national telephone network), there exists a deficit in voice communications service in that area[,]" and directed the parties to file a joint status report to that effect. *Id*. at *10 (emphasis added).

Finally, in *Flower Hill*, ExteNet Systems, Inc. ("ExteNet") sought judicial review of a decision of the Flower Hill Village Board of Trustees (the "Board") denying ExteNet's application for a permit to install wireless infrastructure on public rights-of-way in the Village. *Flower Hill*, 617 F. Supp. 3d at 127. ExteNet presented evidence from Verizon showing "the area around the Village as having insufficient 4G LTE service[,]" and claimed that Verizon had asked  ExteNet "to design and install a network of 66 small wireless facilities within the Village" that "would provide a signal strength of -85 decibel-milliwatts (dBm) to 90% of the area under consideration." *Id*. at 128. In affirming the Board's denial of ExteNet's application, Judge Block focused on "the stated intent of Verizon's contract with ExteNet" – "to improve Verizon's 4G LTE service[,]" and noted that "a signal strength far less than Verizon's desired -85 dBm would still be sufficient to make a phone call." *Id*. at 131. While Judge Block acknowledged that "[i]mproved capacity and speed are desirable (and, no doubt, profitable) goals in the age of smartphones, they are not protected by the Act." *Id.*

*First,* the undersigned acknowledges, as demonstrated by the 4G line of cases, that a showing of a gap in 4G coverage alone does not in itself establish the target area is underserved by voice cellular telephone service under the TCA. However, unlike the carriers in the 4G line of cases who failed to show a gap in coverage in both 3G and 4G service, Crown Castle gathered

data and presented evidence that significant gaps in service existed over various frequencies using different technologies in the Town through which Verizon provides personal wireless services[20]– including *both* 3G and 4G LTE – and that the proposed SWFs would fill the gaps. (ECF No. 31 at 9-10; ECF No. 31-1 at ¶ 97-102). Specifically, the drive test data and coverage maps demonstrated that all 23 proposed SWFs were located areas in which the signal strength for each of Verizon's licensed 4G frequencies is less than the minimum level required to provide in-building voice services, and in which Verizon has no 3G coverage. (ECF No. 31-1 ¶¶ 4, 29, 40, 50-52.)

*Second*, the undersigned finds Defendants' contention that Plaintiff's true objective is not to permit wireless users in the Town to access land-lines, but rather to "*improve*" and "*densify*" Verizon's 4G network is unsupported by the record. Unlike the carriers in the 4G line of cases who failed to put forth any evidence that their proposed facilities would provide voice services, Crown Castle submitted drive test and coverage maps demonstrating that Verizon has a significant gap in each of its 4G LTE frequencies "and absolutely no 3G coverage" over a five square-mile-portion of the Town, as further evidence by the drop call rates it provided, which exceeded industry standard and ranged from 4% to 50% in the areas of the proposed nodes – demonstrating that the SWFs were necessary to provide "access to landlines" (*i.e.*, to enable users to make voice calls) under the TCA.  (ECF No. 31-1 at ¶ 137-138.) As such, the undersigned finds the ZBA's denial "effectively prohibited" Crown Castle's provision of wireless services in and around the Town, and respectfully recommends Plaintiff's motion for summary judgment with respect to its claim for a violation of 332(c)(7)(B)(i)(II) of the TCA.

---

[20] Verizon has historically operated three wireless technologies: (2G), (3G) and LTE (4G). (ECF No. 31-1. at ¶ 5; ECF No. 29-7.) Crown Castle's expert reports that Verizon's 2G and 3G network is "no longer operational in and around the Town." (*Id.*)

**D.  <u>Violation of Section 253(a) – Facial Challenge of the Town Code</u>**

Section 253(a) "Removal of barriers to entry" of the TCA provides: "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C.A. § 253(a).

Plaintiff contends that the Town's actions and inaction throughout the application process, the application criteria, the application fees imposed upon it by the Town, and the ZBA's ultimate denial of Plaintiff's Applications, all violate Section 253(a) because they have the effect of prohibiting the provision of Plaintiff's services in the Town. (ECF No. 29-2 at 2.) The ZBA's decision under Ch. 242, however, is "clearly a zoning decision regarding the placement or construction of Plaintiff's proposed DAS, not a franchising requirement or other potentially discriminatory licensing scheme, the typical subject of a Section 253 claim." *Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*, No. 12-CV-6157 (CS), 2013 WL 3357169, at *16 (S.D.N.Y. July 3, 2013), *aff'd*, 552 F. App'x 47 (2d Cir. 2014). As the Second Circuit has acknowledged, "[s]uch a zoning *decision* is squarely within the ambit of Section 332(c)(7)(A) of the TCA[:]"

> The plain language of the statute indicates that Section 253—which, along with Section 332, is within Chapter 5 of Title 47 of the United States Code—cannot limit the Town's authority regarding the zoning decision (or the time it takes in processing zoning applications). Any limitations on the Town's antenna zoning authority, and the statutory basis for Plaintiff's remedy, must lie within Section 332(c)(7) itself. Plaintiff's position that Section 253 and Section 332(c)(7) are both applicable to the Town's Determination—indisputably one "regarding placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A)—would render the "[e]xcept as provided in this paragraph, nothing in this chapter shall limit" language of Section 332(c)(7)(A) insignificant, if not wholly superfluous.

*Id.* (emphasis added) (citations omitted); *see also Cox Communications PCS, L.P. v. City of San Marcos,* 204 F. Supp. 2d 1272, 1277 (S.D.Cal.2002) (emphasis in original) (distinguishing between Section 253, "which provides a cause of action against *local regulations,*" and Section 332(c)(7), which "gives a cause of action against *local decisions.*"); *USCOC of Greater Mo., L.L. C. v. Vill. of Marlborough, Mo*., 618 F. Supp.2d 1055, 1065 (E.D.Mo.2009) ("Section 253 may be used to challenge zoning regulations on their face but is not the proper section to challenge an application of a zoning regulation.") To this end, 253(a) does not apply to Plaintiff's claims based on the ZBA's denial of its applications or the Town's delay in processing them. *See Crown Castle NG E. Inc*., No. 12-CV-6157 (CS), 2013 WL 3357169, at *17 (dismissing Plaintiff's claims under 253(a) where Plaintiff argued that the Town violated Section 253(a) through its delays in processing and ultimate denial of its applications). Accordingly, the undersigned addresses Plaintiff's facial challenges to Ch. 242 (*i.e.*, the application criteria and application fees) below.

1. **Ch. 242's Application Criteria**

To determine whether Ch. 242 "has the effect of prohibiting the provisions of telecommunications services," under Section 253(a) of the TCA, this Court considers "whether the ordinance materially inhibits or limits the ability of any competitor to compete in a fair and balanced legal and regulatory environment." *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) ("*White Plains*"). In *White Plains*, the Second Circuit found certain portions of the City of White Plains' Ordinance that gave its Common Council the right to reject applications of telecommunications providers to use the rights-of-way in the city "based on any 'public interest factors . . that are deemed pertinent by the City[,]'" amounted to "a right to prohibit providing telecommunications services, albeit one that can be waived by the City[.]" *Id*.

at 76-77. Accordingly, the Court held the City's Ordinance violated Section 253(a) of the TCA. *Id*. at 77 ("[A] prohibition does not need to be complete or 'insurmountable' to run afoul of § 253(a)").

Here, the undersigned similarly finds Ch. 242 effectively prohibits the provision of personal wireless services because it contains certain provisions that give the Town the right to reject a carrier's application based upon vague and subjective factors deemed pertinent by the Town. Specifically, the Court takes issue with the application criteria, which requires applicants to submit documentation that demonstrates: (i) and "proves the need for the wireless telecommunications facility to provide service[;]" (ii) the proposed placement site is "justified, in that alternate placement sites would be unfeasible[;]" and (iii) the facility will "have the least adverse visual effect on the environment and its character and on the residences in the area." (ECF No. 31-1 at ¶ 36.) Ch. 242's applicant criteria provide no objective guidelines for applicants to follow in terms of adequately demonstrating coverage gaps, minimal aesthetic impact, and alternative options to their proposed facilities, as required by the TCA.

For example, Section 242-5(N) 'require[s] only that [the SWFs] 'harmonize' with the surrounding area" and are not "visually intrusive" (ECF No. 31-1 at ¶ 88; ECF No. 29-8.) – visual impact requirements that do not require Town to apply any subjective or objective criteria to determine whether a facility is a significant visual intrusion[,]" but rather allow the Town to "make a site-by-site determination" and "discuss with the applicant whether there are less obtrusive solutions." (ECF No. 29-2 at 29.) In *ExteNet Sys., Inc. v. Vill. of Plandome*, this Court acknowledged similar village code previsions requiring proposed facilities to "minimize visual intrusion" and "blend with the structure to which [they] may be affixed and/or to harmonize with the natural surroundings" impose "relatively discretionary or subjective requirements where

deficiencies may have been difficult to identify." *ExteNet Sys., Inc.*, No. CV197054GRBRLM, 2021 WL 4449453, at *7.

Notably, Ch. 242 "makes no mention of small cell facilities . . . [r]ather, [it] aims to provide a single, comprehensive, wireless telecommunications facilities application and permit process." *New Cingular Wireless PCS, LLC v. Town of Colonie*, No. 20-CV-1388 (NAM)(ATB), 2022 WL 1009436, at *6–7 (N.D.N.Y. Mar. 31, 2022) ("*New Cingular*"). *New Cingular* dealt with a similar code – Chapter 189 – which the Court stated "failed [to] recognize that regulatory concerns differ markedly between small cell facilities and large towers that marked the deployments of the past." *Id*. The Court determined Ch. 189 "set[] up fees and procedural steps (*i.e.*, applicants were required to obtain a zoning verification from the Building Department and submit to a public hearing before any permit could be approved) that d[id] not adequately account for the 'nature and scope' of different requests[:]"

> Thus, for a single small cell to be placed on an existing utility pole in the Town of Colonie, an applicant must go through a gauntlet of costly red tape. And given the density of small cells needed for 5G services, an applicant would have to repeat this arduous process over and over again.

*Id.* The Court ultimately held Chapter 189 of the Town Code, "as applied to a single small cell facility on an existing structure in a public right-of-way, materially inhibit[ed] Plaintiff's efforts to improve its services, and therefore, effectively prohibits the provision of personal wireless services." *Id*.

Ch. 242 similarly requires applicants to go through a lengthy application process in which the Town maintains the right to issue denials based on what the undersigned finds to be vague and subjective criteria, requires applicants to apply for special use permits, and directs them to appear before and appeal to the ZBA for an ultimate determination as to approval (ECF at ¶ 88;

ECF No. 29-8) – procedural steps that do not account for the distinction between "small cell facilities and large towers of the past[,]" and which force carriers like Crown Castle to "go through a gauntlet of costly red tape." (*Id.*)

To this end, the undersigned concludes Ch. 242 "materially inhibits or limits the ability of" telecommunications providers like Crown Castle to "compete in a fair and balanced legal and regulatory environment[,]" and, therefore, "has the effect of prohibiting the provisions of telecommunications services," under Section 253(a) of the TCA. *White Plains*, 305 F.3d at 76.[21]

### 2. Application Fees Imposed Under Ch. 242

As previously mentioned, Ch. 242 imposes the following fees upon Applicants who seek to install wireless facilities within the ROW: (i) $100 application fee for each building permit application; (ii) for the installation of a new DAS node on an existing structure, $650/node if outdoors and $450/node if indoors; (iii) for the installation of a new DAS node on a new freestanding structure, $900 if outdoors and $700 if indoors; (iv) $200 per commercial wi-fi node; (v) $550 ZBA application fee for each special permit application; and (vi) a $2,000 Highway Department permit application fee *per pole* utilized for a wireless antenna[22] (ECF No. 31-1 at ¶ 50-51.)

---

[21] In support of their arguments that Ch. 242's application criteria does not violate 253(a), Defendants primarily rely on *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 580 (9th Cir. 2008) ("*Telephony*"). The Court notes Ch. 242 is distinguishable from the instant case in that the Ordinance imposed "detailed application requirements" as opposed to the vague and subjective ones presented in Ch. 242, and the *Telephony* Court found that the Ordinance "d[id] not impose an excessively long waiting period that would amount to an effective prohibition." *Id.*

[22] Ch. 242, Section 242-16(E), "Fees" explicitly provides: "[t]he fee to be paid to the Highway Department for any application [for permits for wireless facilities in public streets or ROWs] shall be $2,000 per pole utilized for a wireless antenna." (ECF No. 29-15 at 5.)

Applicants are also required to pay an initial escrow fee in the amount of $8,500 per application and, if the balance of the trust account decreases to less than $2,500, the applicant must replenish said escrow account so that it has a balance of at least $5,000. (*Id*. at ¶ 52.) In compliance with the fees set forth in Ch. 242, Crown Castle paid a total of $210,450, including $195,500 in escrow fees, and $14,950 for the building permit application fees and ZBA fees associated with its 23 permit applications made in 2020. (*Id*. at ¶ 53.) Accordingly, upon special permit approval to install 23 SWFs within the public ROWs, Crown Castle would have had to pay an additional $46,000 for highway permits and an additional $19,950 to obtain building permits, increasing Crown Castle's total cost for the SWFs to $276,400. (*Id*. at ¶ 54.)

Finally, the Town charged Crown Castle $250 per hour for everything from Comi's substantive review of the Applications to routine data entry by an administrative assistant, who charges CMS $44 per hour for her clerical work. (*Id.* at 36; ECF No. 31-1 at ¶ 46-47.) CMS invoices in connection with the 2020 Permit Applications "reveal that CMS incurred $19,214.52 in consulting fees or 79.1 hours of time," which Defendants claim CMS used "to review the [A]pplications and communicate with the Town." (ECF No. 30 at 23). Defendants contend that Section 13(f) of Ch. 242 implements a fee cap "as to the total consultant fees to be charged to the applicant, which shall be the greater of $17,000[,]" but do not cite to an Exhibit to support this statement. (ECF No. 30 at 23.)

Relying primarily on *White Plains* and *MetroPCS New York, LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 425 (S.D.N.Y. 2010) ("*Mount Vernon*"), Plaintiff specifically challenges the application fees, escrow deposit, and consulting costs as unreasonable under 253(a). (ECF No. 29-2 at 31.). In *White Plains*, the Second Circuit determined that like application criteria, municipal fees charged in connection with an application to install wireless

60

facilities violate Section 253(a) where they "materially inhibit[] or limit[] the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *White Plains*, 305 F.3d at 76. The Court determined in that case that a provision in White Plains' proposed franchise agreement requiring telecommunications providers to pay five percent of their annual gross revenues from their businesses to the City in connection with their applications to install wireless facilities in the City violated Section 253(a). *Id*. at 67.

In *Mount Vernon*, Plaintiff MetroPCS brought suit against City of Mount Vernon for violations of the TCA – including of Section 253(a) – in connection with the City's denial of its wireless facility application, claiming the City "illegally assess[ed] filing fees and consulting fees against MetroPCS." *Mount Vernon*, 739 F. Supp. 2d at 411. Specifically, MetroPCS claimed that the City "arbitrarily assessed fees on MetroPCS that were not reasonably related to the review process." *Id*. Relevant here, MetroPCS went through the same drawn-out application process as Crown Castle, and the same individuals were enlisted to review MetroPCS's applications: "CMS and Mr. Comi delayed the application by repeatedly requesting unnecessary information and belaboring issues already resolved, resulting in a failure to put the application on the Planning Board agenda for four months after MetroPCS made its final submission in February." *Id*. at 424 (a "finding of unreasonable delay is relevant to the reasonableness of the fees [MetroPCS] incurred throughout the application process").

The Court articulated the standard for evaluating whether a municipalities' fees associated with special permit applications for wireless telecommunications facilities are invalid:

> It is well settled in New York that where a license or permit fee is imposed under the power to regulate, the amount charged cannot be greater than a sum reasonably necessary to cover the costs of issuance, inspection, and enforcement and to the extent that fees charged are exacted for revenue purposes or to offset the cost of general governmental functions they are invalid as an unauthorized tax. Thus, fees charged should be

reasonably necessary to the accomplishment of the statutory command, and the fees should be assessed or estimated on the basis of reliable factual studies or statistics.

*Id*. at 425 (citations omitted). The Court ultimately determined the City's Ordinance addressing special permit applications for wireless telecommunications facilities, which: (i) authorized the City to employ a consultant or expert to assist in reviewing and evaluating applications, and required applicants to reimburse the City for associated costs, without codified limit on fees that could be assessed; and (ii) in contrast to charging $500 for other special use permits, imposed fees between $6,000 to $12,000 for wireless facility applications, was invalid under 253(a). *Id*. at 425-26. The Court reasoned:

> [The City] [did] not present[] any evidence explaining why it is more labor-intensive or time-intensive to review a special permit for a wireless telecommunications facility than another major construction project subject to the $500 special use permit application fee such that the fee for a telecommunications facility should be twelve to twenty-four times higher. The Court is also concerned that there is no limitation on the amount of consulting fees the applicant could be required to pay.

*Id*.

In light of *Mount Vernon*, the undersigned finds the application fees (totaling $14,950 for Crown Castle), escrow fees (totaling $195,500), and consulting fees ($19,214.52) imposed under Ch. 242 (as well as the highway and building permits fees) are unreasonable and effectively prohibit the provision of wireless services in violation of 253(a). As in *Mount Vernon*, the Town here "did not at any time prior to its adoption of the application fees and escrow structure for wireless applicants perform any studies to determine the reasonableness of such fees[,]" and the Town does not otherwise justify the "the large fee[s] associated" with applications for telecommunications facilities. (ECF No. 31-1 at ¶ 59). *Mount Vernon*, 739 F. Supp. 2d at 426.

Also similar to *Mount Vernon*, the Town does not provide any reasoning for the substantial differential in amounts charged for DAS node permits in comparison to other permits.

*See* ECF No. 29-2 at 34; ECF No. 31-1 ¶ 50-51 (Under Ch. 242, "wireless applicants must pay $650 to obtain a building permit to install a DAS node on an existing utility pole and $900 for a DAS node on a new pole, while an application for a commercial wi-fi node must pay only $200 regardless of existing or new infrastructure . . . [w]ireless applicants are also required to pay $2,000 to obtains a highway permit, regardless of the scope of the work, while most other applicants are generally only required to pay $100.") Defendants' argument that the application fees "[are] reasonable in light of the size and extent of a telecommunications application and the limited time frame to review it" was rejected in *Mount Vernon*. *See Mount Vernon*, 739 F. Supp. 2d at 426 (rejecting Defendant's contention that "because the TCA requires that applications for wireless telecommunications facilities be handled without unreasonable delay, this justifies the higher cost.")

With respect to consulting fees, Defendants do not present evidence of a limitation on the amount the applicant could be required to pay, allowing the Town "unlimited discretion to charge wireless carrier[s] prohibitive fee[s] by simply dragging out the process and utilizing consultants for its convenience—rather than out of necessity." *Id.* at 425-26. While the undersigned "recognizes that some legitimate work" was performed on Crown Castle's application, it finds "that the extraordinary costs incurred in this case were largely due to unreasonable delays[,]" caused by CMS, Comi, and the Town, who "constantly demand[ed] information on the feasibility of using DAS[,]" which led to unacceptable delay, and "denied [Crown Castle's] application without substantial evidence." *Id*. at 426-427 ("Therefore, the assessment of fees for work done by CMS and Mr. Comi related to the [Town's] continued insistence on using DAS was overstated as well.")

To this end, because the Court finds the application criteria and fees contained in Ch. 242 are, in effect, prohibitive of a telecommunications providers' provision of wireless services in the Town, it respectfully recommends Crown Castle's motion for summary judgment for its claims under 253(a) of the TCA against Defendants be granted.

## CONCLUSION

For the reasons stated herein, the undersigned respectfully recommends that Crown Castle's motion for summary judgment be **GRANTED** on all three Counts.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:  January 19, 2024

RESPECTFULLY RECOMMENDED,

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge

64